RICHARD J. WATKINS, PLAINTIFF IN ERROR, *v.* THE LESSEE OF OLIVER HOLMAN ET AL.

Ejectment to recover possession of a lot in the city of Mobile, Alabama. The defendants, in the Circuit Court, claimed title to the land under Lucy Landry, who was the devisee of one Geronio; who having been in possession of the lot at the corner of St. Francis and Royal streets, occupied it until his death. On the arrival of Lucy Landry at age, she occupied the lot as her own property; and in 1818 she sold and conveyed it by deed to certain persons, stating the eastern boundary in the deed to be the Mobile river. These persons on the same day conveyed the premises to Oliver Holman, who entered on it and improved it, by erecting houses and a wharf upon it; and continued to occupy it as a merchant in copartnership with one Charles Brown, who lived in Boston, until December, 1822, when he died; leaving, as his heirs, the lessors of the plaintiff. The possession of Lucy Landry of the lot commenced in 1800, and extended on Royal street, and on the east, followed the high water mark on the river. The land was not subject to inundation, though in many places the water ran across it. Until the improvements made by Holman, the lot was not susceptible of occupancy. There was a ridge of high land formed of shells and artificial deposits, to the east of which, to the river, the lot was situated; and the ridge was protected by the Spanish authorities, no person being permitted by them to improve on the ground, or to remove the earth. It was called "The King's highway," or landing-place. Questions as to the title of the proprietors of the adjacent lots above Water street, to the lots extending to the river, prevailed until 1824; when on the 26th May, 1824, a law was passed which granted the lots known as water lots under the Spanish government to the owners of the adjacent grounds. The improvements were made by Holman in 1819 or 1820. The defendants below gave in evidence, to maintain their title, the title to them from Lucy Landry, through her grantees to Oliver Holman: a title-bond from Holman to Brown for half of the lot in controversy, by which a deed was to be executed two years after the date of the bond; and an act of the legislature of Alabama, passed in December, 1823, after the decease of Holman, authorizing the administratrix of Holman, then residing in Boston, where administration of the estate of the deceased had been granted to her, to sell the real estate of which he died seised, in the city of Mobile, for the payment of his debts, the estate being insolvent; a deed made in pursuance of a sale of the premises under the act of Assembly and in conformity to the provisions thereof; and also the record of certain proceedings in the Supreme Court of Massachusetts, wherein a license was given to the administratrix to make a deed in pursuance of the title-bond to Brown, and the deed made under this authority. The questions which arose in the case, and on which the Court decided were: First, whether the act of the legislature of Alabama, authorizing the sale of the estate of Holman, was constitutional and valid. Second, whether the proceedings in the Supreme Court of Massachusetts were operative, and authorized the administratrix to convey the title. Third, whether a volume of state papers published under the authority of Congress was evidence. Fourth, whether the lessors of the plaintiff below had established a legal title. Fifth,

whether the defendants in the Circuit Court had not established a title in themselves, independent of and adverse to the title they had derived under Oliver Holman.

The relation of landlord and tenant in nowise exist between the vendor and vendee; and this is especially the case where a conveyance has been executed.

A mere intruder on land is limited to his actual possession; and the rights of a riparian proprietor do not attach to him. The case of The Mayor of New Orleans *v.* The United States, 10 Peters, 662, cited.

The act of Congress of 26th May, 1824, relinquished the rights of the United States, whatever they were, in the lot in question, to the proprietor of the front lot.

A volume of state papers published under the authority of an act of Congress, and containing the authentication required by the act, is legal evidence. In the United States, in all public matters, the journals of Congress, and of the state legislatures are evidence, and also the reports which have been sanctioned and published by authority. This publication does not make that evidence, which intrinsically is not so; but it gives in a most authentic form certain papers and documents. The very highest authority attaches to state papers published under the sanction of Congress.

The deed executed by the administratrix of Holman, in pursuance of the license given by the Supreme Court of Massachusetts, by which nearly a moiety of the property of Holman, in Mobile, described in the title-bond to Brown, was conveyed to Brown, was inoperative. The deed was executed under a decree, or order of the Supreme Court in Massachussetts, and by virtue of a statute of that state. It is not pretended that it was authorized by any law of Alabama: and no principle is better settled, that the disposition of real estate, whether by deed, descent, or by any other mode, must be governed by the laws of the state where the land is situated.

A Court of Chancery, acting in personam, may well decree the conveyance of land in any other state, and may enforce their decree by process against the defendant. But neither the decree itself, nor any conveyance under it, except by the person in whom the title is vested, can operate beyond the jurisdiction of the Court.

It is not perceived why a Court of law should regard a resulting trust more than any other equitable rights; and any attempt to give effect to these rights at law, through the instrumentality of a jury, must lead to confusion and uncertainty. Equitable and legal jurisdictions have been wisely separated; and the soundest maxims of jurisprudence require each to be exercised in its appropriate sphere.

The act of the legislature of Alabama, which authorized Sarah Holman, resident in Boston, the administratrix of Oliver Holman, to sell the estate of which Holman died seised in the city of Mobile, was a valid act: and the deed made under that statute, according to its provisions, was legal and operative, and was authorized by the constitution of Alabama.

On the death of the ancestor the land owned by him descends to his heirs. They hold it subject to the payment of the debts of the ancestor, in those states where it is liable to such debts. The heirs cannot alien the land to the prejudice of creditors In fact, and in law, they have no right to the real estate of their ancestors, except that of possession, until the creditors shall be paid.

No objection is perceived to the power of the legislature to subjecting the lands of a deceased person to the payment of his debts, to the exclusion of the personal property. The legislature regulates descents, and the conveyance of real estate. To define the rights of debtor and creditor, is their common duty; the whole range of remedies lies within their province.

In error to the Circuit Court of the United States for the southern district of Alabama.

This was an action of ejectment, brought by the defendants, who were plaintiffs in the Court below, to recover possession of stores and a lot of ground in the city of Mobile. The declaration was in the common form. The plea, the general issue. A verdict was rendered in the Circuit Court for the plaintiffs, and the defendant prosecuted this writ of error.

Upon the trial, the plaintiffs below proved that one Geronio was in possession of a lot in the city of Mobile, at the corner of St. Francis and Royal streets; that he occupied the same till his death, when he gave the same to one Lucy Landry; that about the year 1788; Simon Landry took charge of the lot for his daughter Lucy, and when she came to woman's estate, she used and occupied the same as her property. The plaintiff further proved that, in 1818, Lucy Landry conveyed the lot to McKinsie and Swett, by a deed, in which the eastern boundary was laid down as the Mobile river, and included the premises in question in this case. On the same day, McKinsie and Swett conveyed the property to Oliver Holman, who took possession in 1818, and erected houses and a wharf upon the lot, and occupied the same as a merchant in copartnership with one Charles Brown; Brown residing in Boston, and Holman in Mobile. Holman died in December, 1822, leaving three children. Oliver, with a grandchild of Holman, are now the legal heirs of Oliver Holman, deceased, and are the lessors of the defendants in error.

The defendants in the Circuit Court, in order to show title in them to one equal undivided moiety of the premises in question, exhibited a bond executed by Oliver Holman, the ancestor of the plaintiffs in the ejectment, on the 29th September, 1821, to Charles Brown; by which Oliver Holman bound himself to give to Charles Brown a quit-claim deed of one half of the land he had purchased from McKinsie and Swett, the ground in question: the deed to be executed two years from date, if Charles Brown requests. Oliver Holman died soon afterwards, without executing the deed.

Sarah Holman, the widow of Oliver Holman, removed to Bos-

ton, Massachusetts, and there took out letters of administration to the estate of her deceased husband.

Charles Brown presented a petition to the Supreme Judicial Court of Massachusetts, setting forth that Oliver Holman had executed to him the bond before stated, by which he bound himself to convey certain property in Mobile to him, being the part of the premises for which this suit is instituted; and that he was prevented conveying the same by death; and praying the Court would grant license to, and would empower Sarah Holman, the widow and administratrix of Oliver Holman, to execute to him such conveyance of the premises, as Oliver Holman would have been obliged to make and execute, if he were then living.

The widow and administratrix, Sarah Holman, certified to the Court that "she had read and had notice of the petition, and had no objections to offer why the prayer thereof should not be granted; and signified her consent to the same."

Elisha Read, guardian of Sarah Holman and Oliver Holman, minors, and Catharine Holman, daughter of Oliver Holman, certified that they had read and had notice of the petition, and believed the statement therein to be correct, and had no cause to show why the prayer of the petitioner should not be granted, and signified their consent to the same. The Court thereupon ordered that 'Sarah Holman should be licensed to make and execute a deed to Charles Brown of the premises: and accordingly, on the 10th of March, 1824, a deed was executed to the petitioner for the property described in the title-bond.

The defendants in the Circuit Court, also gave in evidence an act of the legislature of Alabama, in the following terms:

"An Act to authorize the administratrix of Oliver Holman, deceased, late of the county of Mobile, to sell real estate.

"Sect. 1. Be it enacted, &c. &c., That the administratrix of the late Oliver Holman, resident in the city of Boston, in the state of Massachusetts, be, and she is hereby, authorized to sell, by Nathaniel Littlefield and Gorham Davenport, her attorneys in fact, the real estate of which the said Oliver Holman died seised in the city of Mobile, on such terms and in such manner as may be deemed most advantageous to the estate of the deceased.

"Sect. 2. And be it further enacted, that the said administratrix be, and she is hereby authorized, by her attorneys aforesaid, on

the sale of the said estate, to make and deliver to the purchaser or purchasers, as the case may be, a legal conveyance of the same, which shall be as binding as if the same had been made by the said Oliver Holman in his lifetime.

"Sect. 3. And be it further enacted, that Nathaniel Littlefield and Gorham Davenport, before the sale of the estate aforesaid, shall enter into bond with sufficient security, payable to the judge of the County Court of Mobile county, for the true and faithful payment of the money arising from the sale of the said estate into the hands of the administratrix thereof, to be appropriated to the payment of the debts due by the said decedent."

On the 24th day of April, 1824, by a deed executed in conformity with the law, in consideration of the sum of fifteen thousand dollars paid to the administratrix of Oliver Holman, the other moiety of the property was conveyed to Charles Brown.

The defendants in the Circuit Court claimed to hold all the premises in controversy by conveyances from the grantee of Charles Brown, made under the license of the Supreme Court of Massachusetts, and the act of the Assembly of Alabama.

It was further in evidence, that Oliver Holman erected stores on the lot, and used them for four years, when he died.

The lot, which was proven to have been in the actual possession of Geronio, was enclosed, there being a line of fence running from the street on the north to the southern boundary of the lot, and followed by the meanders of high tide water mark. There was no person who ever enclosed to the east of this lot, or who had ever set up any claim upon it, except so far as the facts disclosed the claim of Lucy Landry, under Geronio. The ground in dispute was more than one hundred feet distant from the enclosure of Lucy Landry, and was at all times subject to the influx of the tide, prior to the improvements of Holman. It was in evidence that all the land east of Lucy Landry's enclosure, before the improvements of Holman, had been used, as all the land on the same line from St. Francis street to Government street, on the same line, had been used, as a public landing-place by the people under the Spanish government: and that no improvements or obstructions had been erected upon that tract of land.

The Circuit Court decided that the bond from Holman to

c 2

Brown, and the proceedings of the Supreme Court of Massachusetts, and the deed under those proceedings were not sufficient to confer any legal title upon the defendants; these proceedings were without authority and of no effect, and that they were admissible as evidence, only to show the nature of the defendants' claim of possession. The Court also charged the jury that the act of the legislature, and all proceedings under it, were void, and the evidence was competent only to show the defendants' claim and possession; to which decision, as well as to the charge, the defendants' counsel excepted. The defendants then offered in evidence a map obtained from the general land-office at Washington city, purporting to have been made in 1761, and which was certified to have been on file there, made by one —— ——, surveyor. This map indicated that the city was then laid off into regular squares, and bounded by streets; that there was a space between the front square and the margin of the river, not divided, and that this space was marked in the two halves, with the word *quai*. The defendant gave evidence, conducing to prove that the lands sued for were embraced within that space, and that it continued to be public and open, till Holman's possession and improvements in 1818; and so contended before the jury.

The defendants further gave evidence, that Holman and Brown were merchants, and that the carpenters who built the houses on the lands in dispute were sent out by the said Brown; that Brown and Holman were in partnership as merchants, and that in carrying on their business, these buildings were used as storehouses; that Brown resided in Boston, and had never been in Mobile, and that Holman resided in Mobile; that the storehouses were reputed to be Holman's, and not Holman and Brown's. After the death of Holman, agents of Brown went into possession; whether instantly or after the execution of the deeds aforesaid, his agents or vendees have enjoyed entire and exclusive possession of the premises. It was further in evidence that the house in possession of defendants, fronts on Water street, one of the streets of the city: whereupon the Court charged the jury, that if they believed, from the evidence, that Geronio claimed title to the premises in question, and was in actual possession of a part of the lot of land to which they were then

attached, and remained in possession and claiming title from and prior to the year 1785, till the time of his death; and that before his death he gave the whole of said lot to Lùcy Landry; and that her father thereupon took and held possession of it for her until she arrived at full age, when she took possession, and claimed title to the full extent of the boundaries in the deed from her to McKinsie and Swett; and that since the possession of Mobile by the United States, the streets and quai have been so altered by the municipal authorities of said city, that the said quai has been discontinued or otherwise abolished, and the said Water street erected in lieu of it; and that the premises in question are within the boundaries· of the said lot conveyed, as aforesaid, by Lucy Landry to McKinsie and Swett, and by them to Oliver Holman; and that said Holman entered upon and remained in possession of the said premises from the date of his purchase, until the time of his death; the plaintiffs are entitled to a verdict, unless the jury believe, from the evidence, that actual possession was delivered by said Holman to Brown, under said bond for title; and that said Brown had remained in possession, and that the possession had been regularly transmitted through those claiming under him to the defendant. The defendant contended that the premises in question were not embraced within.the claim of Lucy Landry, but formed a portion of the public quai. That the entry of Holman under the title derived from Lucy Landry, and the building of stores on the lot, gave him no title, and that his heirs could not maintain an ejectment for the lot, against those claiming under his partner, Brown. This the Court overruled,-and the counsel for the defendant excepted.

The defendant's counsel contended that, from the bond, the proof in the cause, and the admission of Catharine Holman in the record · of the Supreme Judicial Court of Massachusetts, thereto attached, it appeared that Holman and ·Brown were jointly interested in the premises at the period of his entry. That although Brown never was upon the land, that the same was held by Holman for their joint benefit; and that though no actual possession was delivered under the bond for.title, that if those facts were found, that Brown, or those claiming under him, could not be sued for the moiety in the bond; without a demand and notice to quit. This the Court overruled.

The case was argued by Mr. Ogden and Mr. Legare, for the plaintiffs in error; and by Mr. Crittenden and Mr. Key, for the defendants.

Mr. Ogden contended that, in the Court below, the plaintiffs in error had proved their title to the premises in dispute, and the Court should have nonsuited the defendants, the plaintiffs in the ejectment; or charged the jury that they were not entitled to a verdict in their favour. The plaintiffs in error, and those under whom they claim, had been in possession, under a paper title, since 1822, claiming the premises as their own; fifteen years before the commencement of this suit. Before being turned out of possession, the defendants in error are called upon to show a valid subsisting title to the premises. Possession is a valid title against all the world, until a better title is shown.

The first question now arises—we claim the property under a title derived from Oliver Holman, the ancestor of the defendants in error, his heirs at law. Can we be permitted to question and deny the title of the ancestor under whom we claim?

This point seems to be settled in this Court, in the cases of Blight's Lessor v. Rochester, 7 Wheat. 497; Bradstreet v. Huntington, 5 Peters, 402, and Willison v. Watkins, 3 Peters, 43.

It is denied that Holman ever had a title to the lot in controversy. It is asserted to have been derived from a Spaniard, Geronio; but no paper title is shown to have been in him. All the title set up as having existed in him, was, that of possession of a lot at the corner of St. Francis and Royal streets, to which Lucy Landry afterwards became entitled under him, and which, when of age, she conveyed to the grantors of Oliver Holman. No grant from Spain was made to Geronio; none is asserted to have been given. The enclosure ran down to and along high-water mark, on the line of which there was a fence.

The premises in dispute in this case are more than one hundred feet distant from the enclosure of Lucy Landry, and were all open until improved by Holman.

Geronio having had no paper title, and pretending to no title but possession, nothing can be clearer than that his title extended no further than the actual possession; and he gave no more to Lucy Landry. The law upon this point is entirely settled.

Lessor of Clarke *v.* Courtney, 5 Peters, 354; 2 Johns. Rep. 230; Mass. Rep. 416; 3 Wash. C. C. R. 475.

The title set up by the heirs of Holman not having any other foundation than that of Lucy Landry, it is manifest, that against the holder of the lot by possession and improvement by Holman, and now with the improvements held by the plaintiffs in error, that title cannot be sustained.

There is another view to be taken upon this question of possession, to which the attention of the Court is requested. The fence, including the lot occupied by Geronio, and Landry under him, ran down to high-water mark, and followed the meanders of high-water mark. No person had an enclosure to the east of this lot, or had a claim on it, except Landry: it was more than one hundred feet from her enclosure, and was at all times subject to the reflux of the tide, prior to the improvements of Holman, in 1818. It had been used as a part of a public highway, and as a public landing-place by the people under the Spanish government. These facts clearly prove that there never was even an assertion of title by any one to this lot, before Holman improved it.

Again, the property now in dispute is one hundred feet below what in 1818 was the high-water mark. Now, by the common law, all land beyond ordinary tide water-mark belongs to the crown. It is not necessary to cite cases to prove this as a general principle. The principle is of universal prevalence in the states of the Union, bordering on tide-waters.

It is admitted that the right to the shores of tide-water may be acquired by grants from the crown, or government. Sir Henry Constable's case, 5 Holt, 107; Angel on Tide Waters, 140. Although a grant from the crown may be presumed after long possession. But this only shows that by grant alone the title can be acquired. Appendix to Angel on Tide Waters, 43, and the cases cited. The evidence of such a grant would be the embanking against the sea, and using the ground. Hale de Jure Maris, part I, ch. 6, page 27. But the evidence in this case shows no such state of facts; and if there is any law of Spain which differs on this point from the common law, it should have been shown, and, as a foreign law, should have been proved.

There is another fact appearing on the record, which should

have great influence on the Court in considering the point now under examination. The map gave in evidence has the word "quai," marked upon it, showing that this lot was considered as a quai. City of New Orleans v. The United States, 10 Peters, 715. This shows that the defendants in error have not and never had any legal title to this lot. It was a public landing, and was always so considered while Spain had possession of the country.

The plaintiffs in error, defendants in the Circuit Court, had a sufficient title to give them a right to a verdict in their favour, under instructions from the Court.

Oliver Holman, the ancestor of the defendants in error, died in Mobile, before March, 1823. He died intestate, and administration was granted to his widow. Some time after which, the legislature of Alabama passed the act authorizing the administratrix to sell the estate of Oliver Holman; under the provisions of this act, and in full conformity with them, the administratrix sold the estate, and conveyed it to Charles Brown, under whom, and by virtue of the conveyance authorized by this act, the plaintiffs in error held a moiety of the property. There is nothing in the record to impeach the fairness of this sale, or to show that the property was not sold for its full value.

The Circuit Court held this act of the legislature of Alabama void. The reasons for this decision are not given, but it is presumed they were:

1. It is supposed that the law interfered with and took away he vested rights of the heirs at law of Oliver Holman; or,

2. That this was a judicial act, which it was not competent for the legislature of Alabama to perform.

Does this law take away the vested rights of the heirs of Oliver Holman? If the law is void on this ground, it must be because the legislature had no power to pass this law: for, if constitutional, the law can nowhere be questioned. It cannot be objected to the law, that it infringes the obligation of contracts, and is therefore void under the Constitution of the United States. The law authorized the sale of the lot for the purpose of paying the debts of Holman, and thus enabling the administratrix to keep his contracts. How then can it be incompatible with the obligation of contracts? But it has been declared by this Court, in the case of Satterlee v. Matthewson, 2 Peters, 414, that it has nowhere been

[Watkins v. Holman et al.]

said, that a state statute which divests a vested right, is incompatible with the Constitution of the United States.

Nor is the law inconsistent with the constitution of Alabama.

By the laws of Alabama, upon the death of Holman, his real estate descended to his heirs; but in their hands it was subject to the payment of his debts.   A law which authorizes the sale of such lands for the payment of the debts cannot be exceptionable.   In the constitution of Alabama, there is nothing which, in terms, prohibits the passage of such a law; nor is the law a judicial act, thus trenching on the other constitutional departments.   The law does nothing in its special provision, but what had been done in effect by the general laws of Alabama, authorizing the sale of the estates of decedents for the payment of debts.   But as, from the particular local situation of the administratrix of Oliver Holman, she could not be proceeded against under the general law, this special enactment is made.   The same responsibilities for the payment of the debts are continued; and security is required for the performance of the duties to pay the debts out of the proceeds of the sales.   No vested rights of the heirs of Holman were impaired, for all their rights were subject to the debts of their ancestor.   In support of these principles, cited, Stoddard v. Smith, 5 Binney 355; Wilkinson v. Leland, 2 Peters, 626; Bank of Hamilton v. Dudley's heirs, 2 Peters, 523; 16 Massachusetts Rep. 326; 13 Serg. & Rawle, 435; 2 Vernon, 711; 4 Cruise's Digest, 520.

Toulman's Digest of the Laws of Alabama contains a number of private acts similar to this, on pages 344, 345, 346.   The constitution was formed in 1819, and this act passed in 1824.  It was a contemporaneous exposition of the constitution.

The act was no doubt passed on the application of the administratrix of Oliver Holman, and was enacted to enable her to pay the debts. It does not direct the sale, but authorizes it.  The presumption is that it was passed to enable the administratrix to do her duty.  He who seeks to avoid an act upon the ground that it was procured upon false suggestions, must prove, affirmatively, that the suggestions were false.   There is not only no proof in this case, that Holman's estate was not in debt at the time of his death; but the contrary is nowhere pretended.   The law will therefore be presumed to have passed in good faith.

But it is said this law is against the constitution of Alabama, because it is a judicial act; and thus invades one of the branches of government, which can alone exercise judicial powers.

Without the express prohibition of the constitution of Alabama, limiting to each department its special duties, the separation of the government into legislative, executive, and judicial, was sufficient to prohibit each branch from invading the constitutional powers of the other.

But the act under examination is not a judicial measure. Judicial power is the right to decide between different parties; the power to declare what the law is between conflicting parties, and to carry judgments and decrees into effect. How then can the act in question be considered judicial? It does not decide between the administratrix and the creditors; it leaves all question as to the distribution of the proceeds open; and they must be decided by the judicial tribunals, if the parties cannot adjust them. Cited, Wilkinson *v.* Leland, 2 Peters, 660.

The Courts of the United States sitting in the states, adopt the construction of the constitutions of the states, which have been given by the decisions of the highest judicial tribunals of the states. This is essential to harmony between the Courts of the Union, and of the states. What would be the confusion if one construction were given to the constitution of the state, in the Courts of the states, and in the Courts of the United States a different construction? So, too, as to the laws of the states. It must be very plain that an act of the legislature is a violation of the constitution, to justify a Court to pronounce it void. 5 Mass. Rep. 534; 12 Mass. Rep. 417. In this case we have the uniform legislation of Alabama, since the state was organized, in corroboration of the constitutionality of this act; and titles to lands to an immense value are held under special acts of assembly similar to this. A decision here against the validity of this law, would shake the titles to a large amount of property within the state. The early passage of laws of a similar character with this now under examination, is a contemporaneous exposition of the constitution; for they were passed within a very few years after the constitution was adopted. In Alabama the question was at rest, until disturbed by the decision of the Circuit Court in the case now before the Court.

The title of the plaintiffs in error to one moiety of the property, has never been shown. As to the other moiety, it is seen from the evidence in the case that after the death of Holman, Brown, his partner, went into possession of the whole property. The buildings and wharf were called Holman and Brown's wharf, and Holman and Brown's buildings; and Holman promised by a title-bond to convey one-half to Brown.

Mr. Ogden then proceeded to refer to the proceedings in the Supreme Court of Massachusetts, and to show that they are in entire conformity with the laws of Massachusetts; and that the deed executed by the administratrix to Brown, for the property described in the bond of Holman, was so executed under the decree of the Court, after notice, and with the knowledge and consent of the administratrix and of the heirs of Oliver Holman, acting personally, or represented by their guardian.

The application to the Supreme Court of Massachusetts was similar to a prayer for a decree of specific performance. The Court are asked to permit the administratrix to make a deed in conformity with the contract stipulated in the bond. A deed was made in execution of this decree of the Court.

This presents the question whether, under these circumstances, the defendants below have shown a legal title to this moiety of the property.

The legal estate is considered as so vested in the mortgagee as that he may maintain ejectment against the mortgagor, and turn him out of possession. The legal estate is in the mortgagee, and yet, after his death, the administrator of the mortgagee may recover the amount due on the mortgage, and, by entering satisfaction, destroy the legal estate in the mortgagee. This is so, not only in equity, but in law.

Why is this? Because the mortgage is mere evidence of a debt, which the administratrix has a right to recover, and of course to acknowledge satisfaction for it; and the heir at law is not injured, for his ancestor never had any interest in the land mortgaged, other than as a security for a debt; which being paid, that interest has ceased. Now, in this case, the act of the administrator destroys the legal estate of the mortgagor, and of his heirs. Let that reasoning be applied to the case before the Court.

VOL. XVI.—D

An administrator is bound to perform all the contracts entered into by the testator, whose estate he represents; or to incur damages for the nonperformance of them, so far as the assets in his hands will enable him to do so.

If the testator gave a bond or note, the administrator must pay it; and so in reference to any other contract. The assets in his hands are answerable for the nonperformance of the contracts of the intestate. If he contracted to sell lands, the assets in the hands of the administratrix are liable for damages for nonperformance.

Holman was bound by his bond to convey the moiety of the property to Brown, and Brown could have maintained an action for damages on the nonperformance of this contract by the administratrix. The real estate of Holman could have been sold for the payment of damages.

Holman held this moiety of the property in trust for Brown. He had a bare naked trust, without any beneficial interest whatever in it. As in the case of a mortgage, the receipt of the money by an administrator extinguishes the estate of the heirs of the mortgagee; so, in such a case as this, the administratrix of Holman, by satisfying the claim of Brown, by a conveyance of the estate, divested the estate of the heirs of Holman.

What may be done on compulsion by an administrator, it is contended may be done voluntarily.

It is contended that the estate descended to the heirs of Holman as trustees, Brown and his grantees being cestui que trusts, and in possession of the estate. It is then a case in which trustees having no beneficial interest in the estate proceed by ejectment against the cestui trusts for the estate. This cannot be. 3 Burr. Reports, 1898, 1901; Douglass, 695; 1 Term Rep. 600.

The whole proceedings in the case before the Supreme Court of Massachusetts were regular. The facts were truly stated in the petition; notice was given to all the parties in interest, and no objection made by any one of them. The administratrix conveyed according to the decree. If the decree had been, that the heirs should convey, there could have been no objections to their deed. The question then is, not on the validity of the proceedings in Massachusetts, but on the validity of the deed.

In the Circuit Court, it was held that the plaintiffs in error had shown no valid title to the lot.

It is to be observed that, independent of the proceedings in Massachusetts, the heirs of Holman never had any beneficial estate in this moiety of the lot. Brown's money had paid for it, and their ancestor had promised to convey it. They had no equitable title in it. With the strictly legal estate, they had a barren sceptre in their hands; liable to be taken from them, at any moment, by Brown. A bill in equity filed by Brown, or by the plaintiffs in error, would compel them to part with their legal estate, which they now rely upon in this action. This they cannot do. The whole property had been improved by the joint funds of Holman and Brown; ard a moiety was held by Holman as trustee. There was a clear resulting trust in favour of Brown, by the appropriation of his money to the purchase and improvement of the property. Cited, Story's Equity, 439, 243, 444.

It was for some time doubted, whether, to raise this resulting or implied trust, it should not appear on the face of the deed passing the estate, that the consideration was paid by another. This doubt no longer exists. (Note to Story's Equity, 443, sec. 1201.) In Wray v. Stull, 2 Ves. & Beam. 388, it is expressly ruled, that where a joint advance is made, and the deed is taken in the name of one only, there is a resulting trust in favour of the other. Holman then held this property, as to one moiety, in trust for Brown.

Was this trust executed by the statute of uses? This has not been so held in the cases in 1 Piere Williams, 112: but without questioning this decision of Lord Chancellor Cowper, it may be safely urged, that the language of the English statute of uses, and the statute of Alabama, are different. By the statute of Alabama the trust is executed. Aikin's Digest of the Laws of Alabama, 94, note 37.

It is contended that under the law of Alabama, the original deed to Holman conveyed to Brown one moiety of the lot; he being entitled to the same in consequence of having paid one-half of the purchase-money.

But if this position is doubted, it is not essential to the case of the plaintiffs in error to maintain it. We have a bond from Holman, under his hand and seal; and this is a good declaration of trust. 2 Piere Williams, 314. Thus Holman acknowledged that

[Watkins *v.* Holman et al.]

he held one-half of this property in trust for Brown, and here is not an implied, but an express declaration of th· ·trust.

It is contended that the proceedings·in Massachusetts were equivalent to a decree by a Court of Equity for·a specific performance : but if this was not the fact, they did not render invalid the rights of Brown under the laws of Alabama; which it is claimed were such as could not be disturbed by the heirs of Holman, who were no more than trustees.

Mr. Key, for the defendants in error.

The heirs of Oliver Holman, who were plaintiffs in the ejectment in the Circuit Court, are charged with an attempt to recover lands which have been sold for the payment of the debts of their ancestor; and the proceeds of that sale justly applied to that purpose. But the plaintiffs below have no disposition to defeat the rights of creditors. If they recover the land, they will hold it subject to the debts; and they will be liable to the purchasers, if the debts of their ancestor were paid out of the proceeds of the sale.

It is said the defendants in the Circuit Court could have impeached the sale for fraud; and that, not having attempted this, its fairness is to be presumed. It is contended that it was the duty of the plaintiffs in error to have proved the fairness of the proceedings. Their course was unusual : they went out of the established mode of proceeding. The general law of Alabama was open to them. ·The property of Holman might have been sold for the payment of his debts, in the usual manner of proceeding. The bond of Holman to Brown might have been the subject of a suit in the Courts of Alabama. A presumption of unfairness is warranted by the unusual mode of proceeding. Had the Courts of Alabama been resorted to, all would have been legally done. Proof that Holman owed debts, which his personal estate could not pay, would have been given; and all parties would have had notice.

The objections to the title to Lucy Landry have no foundation. The evidence showed that she had in her possession and claimed title to the land to the river; and all she had was conveyed by those who conveyed to Holman.

But the plaintiffs in error cannot contest this title, because they

claim in no other way than under the same title. 10 Johns. 223, 293, 358; 2 Wend. 14.

But it is said the title of the defendants in error is only a legal title; that the plaintiffs have the equity: that the defendants in error are trustees, and the plaintiffs are cestui que trusts. How is this made out? Brown and Holman were partners, as merchants. There must be a clear trust made out, before a Court of Equity will decree a trust. Here there is nothing; certainly, as to all the property; except the part mentioned in the bond to Brown. They were not partners as to the land.

Then their title as to that portion, and the effect of the Massachusetts license, and the deed under it, must be considered. Suppose these Massachusetts proceedings regular, the order of Court gives no title. The deed was executed in March, 1824; and before this time, in 1823, the act of the legislature of Alabama had ordered all the real estate of Holman to be sold. Could part of the estate be conveyed subsequently to this law, to Brown, and another part sold under the law?

But the proceeding is a nullity. Laws of Massachusetts, vol. 1; 2 Peters, 655; 8 Peters, 144. If this proceeding is a nullity, the bond, and the admissions of the widow, and of the infant heirs of Holman, are not evidence; and they cannot be used to set up a trust, or a declaration of trust, and nothing can be claimed under them.

The main question in this case is the validity of the law of Alabama. The act authorizes the sale of the real estate of Oliver Holman by his administratrix, through her attorneys, "on such terms and in such manner," &c., and gives no direction for the payment of the debts; nor was it shown that his personal estate was not sufficient to pay his debts.

Who were the parties to the transaction? Who applied for the law? Was it Sarah Holman, or her attorneys? She was a non-resident; she administered in Massachusetts, and it nowhere appears that she had administered in Alabama.

The first objection to the validity of this law is, that it is a private act, and can bind none but the parties to it. Consequently it did bind the creditors or the heirs. 2 Black. 346; 16 Mass. 330, 331, 332; 5 Cruise, 8; 8 Johns. 520, 555, 556; Anstruther. 288, 291, 294; 7 Johns. Rep. 555. Therefore, no matter how

far the powers of the legislature of Alabama are unrestricted; this law could not bind either creditors or heirs, because they were not parties to it, or named in it.

Second. But the legislature of Alabama had no power to pass this law. It would be contrary to a law of Congress. Toulmin's Digest, 911, 912, 453. If it deprived any one of a trial by jury, or of "judicial proceedings," it would violate the Constitution.

Third. It is prohibited by the constitution of Alabama. The powers of government are carefully distributed by the constitution of Alabama. Each department is to exercise its functions exclusively. The judicial power is vested in the Courts, but this was an act of judicial power exercised by the legislature. 2 Black. 346; 6 Cranch, 135; 11 Mass. 396; 3 Yerger's Rep. 269, 557, 605, 606; 4 Yerg. 202; 5 Yerg. 320; 1 New Hamp. Rep. 204; 3 New Hamp. Rep. 493; 4 New Hamp. Rep. 19, 109; Baldwin's C. C. Rep. 219.

It is judicial power. Ogden v. Blackeledge, 2 Cranch, 272; 3 Dall. 386; Wilkinson v. Leland, 2 Peters, 633; Crane v. Maginnis, 1 Har. & Gill, 475; 10 Yerg. 69, 70. It is judicial, because given to Courts. Aikin's Digest, 180, 181. It is also retrospective. 2 Gallis. 139; 7 Johns. Rep. 477, 493; 11 Mass. 396. It impairs vested rights, and puts aside the standing laws. 11 Mass. 396; 4 Wheat. 441; 4 New Hamp. Rep. 572.

The act does not proceed on the allegation that there are debts due by the intestate, Holman, for which the estate is to be sold. Suppose there were no debts, yet the estate has been sold. If it is said the question as to there being debts is left to the Courts; then this is but a declaratory act, and the administratrix should have applied to the Court, and a sale without such application is a nullity.

The vested rights of the heirs were taken away by this act. They had such rights. They might have entered on the land; and although, by the laws of Alabama, it was liable for the debts of their ancestor, yet this law takes all these rights away, without their knowledge or consent. But it is not true that the heirs held the land subject to the debts of their ancestor. This liability did not exist, until it had been ascertained that the personal estate of Holman was insufficient to discharge his debts. This should have been judicially decided, in due course of law, where they

would have been represented and heard.   3 Peters' Rep. 10. Before the land could have been sold by judicial proceedings, it should have been proved that there was no personal assets, or, if any, that the administratrix and her sureties were insolvent. The legislature having committed this subject to the Courts, it had no power over it.

To show that the interference of the legislature on the subject of the sale of the estates of intestates was deemed unconstitutional in Alabama, Mr. Key referred to reports of committees of the legislature in 1823, against the exercise of such a power.

It is denied that the proceeding in the Supreme Court of Massachusetts could authorize the sale of the other moiety of the land.

The laws of Massachusetts do not authorize such a proceeding for the sale of land out of the state; and if they did, they would be invalid as to land not within that commonwealth.   All the regulations for the sale of land are necessarily local; and in every state titles to land within the state can only be made or acquired by its own laws, or proceedings authorized by it.

Mr. Crittenden, also for the defendants in error.

The principal questions in the case are upon the validity of the conveyance under the decree of the Supreme Court of Massachusetts, and the validity of the act of the legislature of Alabama, authorizing the sale of the estate by the administratrix of Oliver Holman.

As to the first, the Court determined that the bond, the decree, and deed made under it, conferred no legal title, and were "admissible only to show the nature of the defendant's claim and possession."

This decision is supposed to be correct, because there is no law of Massachusetts authorizing such a decree, if the subject was within her jurisdiction.   Secondly, because the subject is extra-territorial to her, and over which she has no jurisdiction: and, thirdly, because the parties, whose title was divested, were not before the Court.   And it is against the first principles of law to affect a party who has had no opportunity of defence.

As to the second question, concerning the sale and conveyance under the act of assembly, the Court decided that this evidence

·" was not sufficient to maintain the defendant's title;" and "that the act, &c., and all the proceedings under it, were void."

This act, considered as an authority to sell, ought, from its own nature, and especially from the circumstances of the case, to be construed strictly. It was evidently the intention of the legislature to annex this authority to the official character of the administratrix; and the term administratrix cannot be regarded as mere descriptio personæ, because the money to arise from the sale is to be paid into her hands; "to be appropriated to the payment of the debts 'due by the said estate." It was essential, therefore, that the person selling under this law should have been the lawful administratrix; and, as such, bound to make the directed appropriation of the proceeds of the sale. There is no proof that Sarah Holman was the administratrix; or that she was administratrix within the state of Alabama. If administratrix anywhere, it was in Massachusetts. Proof that she was administratrix, and that administration was granted to her in Alabama, was essential to the validity of the sale and deed under the act. And for that cause, if no other, the decision of the Court was correct in denouncing the deed as "insufficient to maintain defendant's title."

But we contend further, that the act of the assembly of Alabama is contrary and repugnant to the constitution of the state of Alabama, as decided by the Circuit Court.

By a general statute of the legislature of Alabama, passed long before the special act in question, (Toulmin's Digest, 327, 328, 338,) provision is made for the sale of the real estate of decendents, where their personal estate is insufficient for the payment of their debts, by certain proceedings before the Orphans Court, in which the heirs of all persons interested are to be cited, and a full exhibit of the condition of the estate made by the executor or administrator; and thereupon, if it appear proper, the Court may direct the executor or administrator to sell so much of the real estate as may be necessary, &c. In the proceedings directed by this statute, the most careful regard is had to the interest of heirs, and the preservation of their rights. To this law, enacted in 1803, the heirs of Holman, and their inheritance were properly subject; and by "due course of law" the land descended to them might, on the application of the

executor or administrator of their ancestor, have been sold for the satisfaction of their ancestor's debts. The special act in question usurps, as to this particular case, the judicial function assigned by the existing general law to the Orphans Court; and, without notice, hearing, or defence, on the part of the heirs, (in whom the title was as fully vested as ever it was in their father,) authorizes an administratrix to make sale of their inheritance. We say that the legislature could not take from them their property, nor their right of defending their title in a " due course of law;" which, as we understand, can only be had before some judicial officer or tribunal.

By the constitution of Alabama, the powers of government are divided into three distinct departments, and each confided to a separate body of magistracy; to wit : the legislative, executive, and judicial; and each is forbidden to exercise any power properly belonging to either of the others. This general provision, we suppose, is violated by the power exercised in this act.

We suppose also that the act is repugnant to several provisions of that constitution. By the tenth section of the first article, no one accused even of crime can be deprived of his life, liberty, or property, " but by due course of law." He cannot in such case be deprived by an act of legislation. Is a man accused of debt in a worse situation than one accused of crime; and may he be deprived of his property by the legislative power, and without " due course of law ?"

The nineteenth section of the same act, when taken in connection with the latter part of the eleventh section of that article, seems to authorize and require that the terms "ex post facto" should extend to cases of this description as well as to criminal cases; and be construed as equivalent to a prohibition of retrospective laws of all descriptions. To confine it to criminal cases, would be to express in very untranslatable Latin, what had been before expressed, in the eleventh section, in very plain English.

By the twenty-ninth section of the same article, it seems to be clearly intended that every one, in every " civil cause," in which his interests are involved, shall have the privilege of defending himself before " any tribunal in this state;" and shall not be "debarred" therefrom. It is asked if the legislature have not "debarred" the heirs of Holman of this constitutional right, in the

most effectual of all possible modes; by dispensing with a suit that would otherwise have been necessary, and deciding the "civil cause" by legislative act?

We are further justified in concluding this act to be unconstitutional by the controlling authority of the construction in which all the functionaries of the government of Alabama have for a long time past concurred and settled down. It is now the settled doctrine of that state, that all such laws as this are contrary to the constitution; this is the rule of decision in her judicial tribunals.

And her legislature has, in the most solemn and explicit manner, announced the same opinion, and for years past have acted upon it, by refraining from passing any such laws. House Journal of 1833, pages 27, 28, of petitions for such laws, and report thereon by Mr. Hopkins, chairman, &c., 35, 36; and report concurred in by a vote of fifty-six to five, p. 36. See also pages 35, 45, for petition of M'Loskey, and report thereon. Senate Journal of 1833, the case of Raney's administrator, &c., 57, 68, and report, &c., 73. House Journal of 1834, petition of Carr's administrator, to sell the land of his intestate, p. 65, and report thereon, p. 92. These documents and records show the opinion and course of decision in Alabama, in respect to the constitutionality of this and similar acts of legislation.

The lot, as originally held by Geronio, fronted on the river as its eastern boundary. The river has receded to the west, considerably, in the lapse of many years, and, by deposits made by ebb and flow of the tide, there has been a gradual formation of land all along that shore of the river. On the trial, the defendant gave in evidence a map, &c., conducing to prove that the city was laid off in squares, and that there was a space between the front square and the margin of the river, marked "quai;" and gave evidence conducing to show that the premises now in question were embraced in that space, and that it continued to be public and open, till Holman entered and improved in 1818. It was in proof, that the house and premises in question front on Water street.

On this the Court instructed the jury that if they believed from the evidence "that Geronio claimed title to the premises in question, and was in actual possession of a part of the lot of land to

[Watkins *v.* Holman et al.]

which they were then attached," &c.; and that since the possession of Mobile by the United States, "the streets and quai have been so altered by the municipal authorities of said city, that the said quai has been discontinued, or otherwise abolished, and the said Water street erected in lieu of it, &c.; and that the premises in question are within the boundaries of the lot conveyed as aforesaid to Holman, and by him occupied and improved as aforesaid, &c.; that the plaintiff was entitled to a verdict, &c."

The defendant can have no cause to complain of this instruction. If it was not correct, the defendant, to entitle himself to a reversal, ought to have set out all the evidence to show this Court that it had operated to his prejudice. Here no such thing appears. He has not set out all the evidence; and it may well be that all that the evidence that is set out conduced to prove was clearly disproved by other testimony. And every thing is to be presumed in favour of the verdict. Besides, if all the facts were as the defendant's evidence conduced to prove them, no instruction that the Court could have given on them, would have entitled him to a verdict; because the defendant held and claimed under Holman's title, and that alone, and is concluded from denying that title; and because Holman's possession is evidence enough of title against all the world, except the rightful owner; and if he could have been permitted to make out that the premises in question were not parcel of Holman's lot, it follows that the defendant shows that he has no title; and is a mere intruder into the houses and possessions of Holman, and his heirs.

Whether the premises in question were parcel of the lot originally belonging to Geronio, and afterwards conveyed to Holman, was purely a matter of fact for the jury; and the verdict has settled it.

If a question of law could have arisen out of the facts of the case, as to the rights of the owners of lots fronting on the river, to alluvial accessions gradually made to them by the action of the river, &c., that question, plain enough on general principles and rules of law, is authoritatively settled in this case by the act of Congress of the 26th May, 1824, 7 Laws of the United States, 318.

Mr. Legare, for the plaintiffs in error.

The plaintiffs in error are bonâ fide purchasers, who bought under the solemn sanction of an act of the legislature of one of the most enlightened states of the Union. Against rights so acquired, the claims of the heirs at law have been set up. These rights were regarded when other principles in reference to real estate prevailed; when it was the policy to secure the realty to the heir, in preference to satisfying the demands of creditors. But, now, no such policy, and no such injustice prevails. Real estate, like personal property, is subjected to debts; and the rights of heirs at law are inferior to those of just creditors. Certain facts are undisputed in this case:

1. There is no paper title to the lot. The right of Geronio to the same was by long possession, and this right only, and no more was held by Lucy Landry.

2. The ground in dispute was one hundred feet from the enclosure of Lucy Landry.

3. Lucy Landry conveyed in 1818, to those under whom the plaintiffs in error held, and now hold the property.

4. All the land up to the time of the possession and improvements of Holman was open, and used as a public landing, as a "quai."

5. The proceedings in the Supreme Court of Massachusetts, and the act of the legislature of Alabama, and the conveyances under the same to the plaintiffs in error.

First. As to the title set up by the defendants in error, who were plaintiffs below. Are we at liberty to contest that title; or are we estopped, because the conveyances to the plaintiffs in error are derived from Holman's possession, whose heirs at law the defendants in error are? Estoppels are of things certain. Courts do not lean in favour of them. Vendor and vendee do not stand in the same relations as landlord and tenant. The same rules do not govern them. The condition of vendor and vendee is different. Cited, Blight v. Rochester, and other cases referred to by Mr. Ogden.

The title of Lucy Landry does not cover the land in dispute. Accretion does not apply to limited possession. The title was by possession, and possession extends no further than the actual pedis possessio. The title was limited to the fence which ran to

[Watkins v. Holman et al.]

high-water mark. Cited, 2 Johns. Rep. 230; 6 Cowan, 617; 1 Cowan, 276.

The law of alluvion applies only to possession. 1 Justinian's Institutes, book 2, title 1, paragraph 20; Heniccius, 158; Grotius, book 2, ch. 8, page 12. The law of accretion should give the ground which is thus raised from the water to the public. It ought not to become private property. If the Court decide that the plaintiffs in error come in to the question of the title of those who claim the property from them, they will decide against any right which they may set up as accretion.

The statute of 1824 was intended only to confirm the title of those who were in the actual possession of the ground on the river; and cannot be construed to sustain a title which denies the right of possession.

Under the circumstances exhibited in the case, the purchase and improvement of this property out of the joint funds of the partnership of Holman and Brown, Brown had a resulting trust in one moiety of this property, which will be protected in a Court of law. The estate of a cestui que trust may be set up in a Court of law. To the cases already cited to sustain this position are to be added, 3 Johns. 216; 16 Johns. 199; 10 Johns. 97; 7 Wendell, 379.

Resulting trusts are excepted out of the statute of frauds, and may be proved by parol. 4 Kent's Com. 306; 2 Wash. C. C. R. 441; 2 Atkins, 71.

If it is proved that this property was purchased with partnership money, the plaintiffs in error were owners in law. This is fully proved.

The proceedings in the Supreme Court of Massachusetts are res adjudicata. The Court proceeded on the ground that there was a trust; and they directed the administratrix to convey, after all the notice required by the law of Massachusetts had been given to the infants, and to the heirs at law. The contract of Holman was a personal contract, and it was therefore proper that the administratrix should convey.

The act of the legislature of Alabama, under which the other moiety of the property was sold, makes the land equitable assets for the payment of the debts. This is no more than leaving to the Courts to settle all other questions. The statutes of Alabama

allow a foreign administrator to represent the estate of a deceased person.

The heir at law is a bare trustee for creditors. Lands are sold for the payment of the debts of a decedent, without making his heirs parties to the proceedings. 2 Cranch, 407; 1 M'Cord's Chan. Rep. 294; 4 M'Cord's Chan. Rep. 128; 4 Kent's Com. 429. The law of Alabama does no more than authorize that to be done at once, which by a long course of proceedings in the Courts could have been effected. It is impossible to lay down the limits between legislative and judicial powers. It is not in the power of the Courts to interfere, and say this was not legislative power; and thus to assume a control over the legislature which will destroy it. This Court will not sustain such an interference. The only objection to this law is, that it was passed in a particular case; but this does not annul the law. The proceedings in the legislature of Alabama, subsequent to this act, may have been proper, but they do not show that the power to pass the law did not exist.

The result of this reasoning is, that the legislature have the power; and the exception must be made out fully by the language of the constitution. It must be clearly shown that the law was against the constitution.

There is no pretence to say this was a judicial act. The law does not affirm that there were debts. All it did was to declare the land subject to the debts. The existence of the debts, and their amount, are to be made out before the Court.

The constitution of Alabama says no more than is said by all the constitutions of the states. The powers of the government are divided in every state. No objections can be made to the law, on the ground that it was ex post facto. Ex post facto laws prohibited by the Constitution of the United States are laws relating to crimes. None of the cases cited sustain the position that this act is unconstitutional. Cited, 1 Gill & Johnson, 474; 2 Kent, 104; 2 Gallis. 100; 1 Kent's Com. 455, 456.

Has the law of Alabama been executed? This question was not made below; but if it had been, it would have been shown that the law was entirely complied with. The administratrix did what she was allowed to do, by converting the land into

assets to pay the debts; the security required by the law having been given.

Mr. Justice M'LEAN delivered the opinion of the Court.

This cause is brought before this Court, by a writ of error to the Circuit Court of the United States for the southern district of Alabama.

The heirs of Holman commenced an action of ejectment against the plaintiffs in error, to recover possession of a certain lot in the city of Mobile. On the trial, the lessors of the plaintiffs proved that, before the year 1785, one Geronio was in possession of a lot in the city of Mobile, at the corner of St. Francis and Royal streets, which he continued to occupy until his death. Previous to his death he devised the lot to Lucy Landry, whose father, Simon Landry, took charge of it for his daughter until she became of age, when she occupied it as her own property. In 1818 she conveyed the lot to M'Kinsie and Swett, by deed, in which the eastern boundary was stated to be the Mobile river; and it is admitted that the deed embraced the lot in dispute.

M'Kinsie and Swett conveyed the premises on the same day to Oliver Holman; and in 1818 he took possession of the lot in controversy, erected houses and a wharf on it, and continued to occupy it as a merchant, in copartnership with one Charles Brown, who lived in Boston, Massachusetts, until December, 1822, when Holman died. He left, as his heirs, the lessors of the plaintiffs.

There was no proof of any paper title in Lucy Landry or her father, except the will above stated. Her possession commenced in the year 1800, or prior to that time; and it was proved that her enclosure extended on Royal street, the whole distance claimed in the declaration; and, on the east it followed the high-water mark of the Mobile river.

It was proved that Water street, which runs parallel with Royal street and the Mobile river, was an irregular bank, reaching from St. Francis street southerly, the length of the city, formed by a deposit of shells and earth, and was higher than any land east of it, or any land to which the water extended. This land was not subject to inundation, though in many places the water ran across it.

Until the improvements by Holman, the lot in controversy was not susceptible of occupancy. Water street was laid out in 1817 or 1818, and the lot in dispute lies east of that street and east of the high land above described. The ridge or high land was protected by the Spanish authorities; no person was permitted to remove the earth or improve on the ground. It was called the king's highway and landing-place. And after the American authorities took possession, the general impression seemed to be that the ground east of Water street did not belong to the proprietors of lots west of it. But these proprietors in some instances made entries on this ground; and in others, entries were made by the corporate authorities of the city.

Under this state of doubt, the act of Congress of the 26th of May, 1824, was passed. Holman, it seems, built a wharf and warehouse on the lot in 1819 or 1820, and these were among the earliest improvements made east of Water street.

The defendants proved that since the year 1823, they, or those under whom they claim, have had the exclusive possession of the lot; and that they made valuable improvements thereon. They gave in evidence copies of deeds from Lucy Landry to M'Kinsie and Swett, and from them to Oliver Holman. They also exhibited in evidence a title-bond, dated the 29th of September, 1821, from Holman to Brown, for half of the land conveyed to him by M'Kinsie and Swett, excepting certain parts described. The deed was to be executed in two years. A map was also in evidence, purporting to have been made in 1760, by a French surveyor. The map represented the land lying near the river as divided into oblong squares bounded by streets, and that the vacant space between the river and the front line of the square had the word "quai" written upon it. But it is not shown by what authority this map was made, or that it governed in the sale of lots. Until the year 1817, the king's wharf was the only one in the city.

To explain the nature and extent of Lucy Landry's claim and possession, certain documents from the land-office at St. Stephen's, Alabama, were offered in evidence; and also an act of the legislature of Alabama, passed the 21st of December, 1823, authorizing the administratrix of Oliver Holman to sell the real estate of which he died seised in the city of Mobile. It was proved

that Holman's estate was insolvent; and it was admitted that the attorneys of the administratrix, named in the act, had given the bond required before the premises in question were sold. The deed made in pursuance of the sale under the act of the legislature was read; also a record of certain proceedings in the Supreme Court of Massachusetts, wherein a license to the administratrix was given to make a deed in pursuance of the title-bond to Brown, and the deed that was made under this authority.

The Court instructed the jury that the act of Alabama was unconstitutional and void, and that no title passed under it; and that the proceedings in the Massachusetts Court were inoperative, and did not authorize the administratrix to convey the title.

The Court also overruled, as evidence, the documents above offered, contained in a volume of state papers published under the authority of Congress.

Exceptions were taken to the rulings of the Court, and to their instructions to the jury; and on these, the questions for consideration arise.

The plaintiff in error asks a reversal of these judgments on two grounds.

1. Because the lessors of the plaintiff showed no legal title.

2. Because the defendant established a title in himself.

On the part of the defendant's counsel it is contended, that, as the plaintiff in error claims under Holman, he cannot question his title: and in support of this position the cases of Jackson ex dem. v. Bush, 10 Johns. 223; Jackson ex dem. Bowne v. Hinman, 16 Johns. 292, 293, are relied on. But these are cases in which the lessors of the plaintiff claimed under sheriffs' sales; and the defences set up were under the defendants in the judgments. The Court say, "The rule, excluding a defendant against whom there has been a judgment and execution from defeating the purchaser's recovery of his possession, by setting up a title in some third person, is founded on justice and policy; and the reason of the rule equally applies where such defendant has, in the mean time, delivered up his possession to another." The case of Brant ex dem. Cuyler et al. v. Livermore, cited from the same volume, arose between landlord and tenant. And the decision relied on in Schauber v. Jackson, 2 Wendell, 14, does not sustain the ground assumed.

E 2

The relation of landlord and tenant in no sense exists between the vendor and vendee; and this is especially the case where a conveyance has been executed. In the language of this Court, in the case of Blight's Lessee v. Rochester, 7 Wheat. Rep. 548, the vendee acquires the property for himself, and his faith is not pledged to maintain the title of the vendor. If the vendor has actu lly made a conveyance, his title is extinguished." And the Court say, " The property having become, by the sale, the property of the vendee, he has a right to fortify that title by the purchase of any other which may protect him in the quiet enjoyment of the premises."

To the same effect are the cases of the Society for the Propagation, &c., v. the town of Pawlet, &c., 4 Peters, 506; Jackson ex dem. Bradstreet v. Huntington, 5 Peters, 402; Thomas Willison v. Watkins, 3 Peters, 43.

ntucky, it is well established that a purchaser, who has obtained a conveyance, holds adversely to the vendor, and may controvert his title. Voorhies v. White's heirs, 2 Marshall, 27; Winlock v. Hardy, 4 Lit. Rep. 274. And this is the settled doctrine on the subject.

The plaintiff in error contends, as the lessors of the plaintiff have shown no paper title emanating from the government, they must be considered as trespassers; and that their right is strictly limited to the pedis possessio of the occupants under whom they claim. That a mere trespasser cannot set up the right of a riparian proprietor, unless his enclosures are extended so as to include the alluvial formations.

In the case of Ewing's Lessee v. Burnet, 11 Peters, 41, this Court held that an enclosure was not necessary to show possession, under the statute of limitati ns. That for this purpose it is sufficient to show visible and notorious acts of ownership exercised over the premises.

In this case it appears that the proprietors of the contiguous lots, by a deposit of earth and other means, contributed to the new formation on the shore of the river; so that this formation was not wholly attributable to the action of the tides. And it may well be contended that this labour of the proprietors made their claim and possession of the water-lot as notorious as if it had been surrounded by an enclosure. It appears, too, that the

wharf and warehouse were erected by Holman on the lot in dispute, as soon as it was susceptible of occupation. These facts, connected with the possession of the adjacent lot since 1785, present a strong ground to presume a title. And so far as regards the controversy between the parties to this record, and looking only at the facts and circumstances before us, we think that the lot in dispute may be considered as included in the title of Holman.

The position assumed by the plaintiff's counsel, that a mere intruder is limited to his actual possession; and that the rights of a riparian proprietor do not attach to him, is correct. He can have no rights beyond his possession. The doctrines of the common law on this subject have been taken substantially from the civil law. In the case of the Mayor of New Orleans v. The United States, 10 Peters, 662, we had occasion to examine this doctrine, especially in reference to the laws of Spain.

The act of Congress of the 26th May, 1824, entitled "An act granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of said city," embraces the lot in controversy; whether the title be vested in the lessors of the plaintiff, the defendants in the ejectment, or in the city of Mobile. As no right to this lot is asserted on the part of the city, we can now only consider the law as affecting the title before us.

At the time the law was passed, either the plaintiffs or defendant were the proprietors of the front lot, and claimed the water lot with its improvements; and this brings them within any known construction of the act of 1824. It relinquished to the proprietor or proprietors of the front lot, under the circumstances of this case, whatever right, if any, the United States had to the water lot.

The volume of state papers offered in evidence by the defendants, we think, should have been admitted. This volume was published under an act of Congress, and contains the authentication required by the act. Its contents are, therefore, evidence.

The recital in the preamble of a public act of Parliament of a public fact, is evidence to prove the existence of that fact. Rex v. Sutton, 4 Maule and Selwyn, 532; Starkie on Evidence, 197. The journals of the House of Lords have always been admitted as evidence of their proceedings, even in criminal cases; and the

journals of the House of Commons are also admissible. It is said that the journals are not evidence of particular facts stated in the resolutions, which are not a part of the proceedings of the House; as, for instance, a resolution stating the existence of a popish plot would not be evidence of the fact in a criminal case. Jones *v.* Randall, Cowp. Rep. 17; 5 Term Rep. 465; Doug. 572; Starkie's Ev. 199.

In this country, in all public matters, the journals of Congress and of the state legislatures are evidence; and also the reports which have been sanctioned and published by authority. This publication does not make that evidence which, intrinsically, is not so; but it gives in a most authentic form certain papers and documents. In the case under consideration the volume of documents was offered to show the report of certain commissioners under an act of Congress confirming the title in question. Now, this original report, duly authenticated by the treasury department, to which it was made, would be evidence; and it is evidence in the published volume. The very highest authenticity attaches to these state papers published under the sanction of Congress.

We come now to consider the proceedings in the Supreme Court of Massachusetts. These proceedings took place under a statute of that state, and were founded upon the title bond given to Brown by Holman, for nearly a moiety of the lot purchased by him from M'Kinsie and Swett. Brown applied to the Court by petition; setting out the title bond and representing that Holman had deceased, without making a deed; and he prayed that Sarah Holman, his administratrix, might be licensed and empowered to execute to him such a conveyance of the premises as Holman would have been obliged to make if he were living.

Sarah Holman, as widow and administratrix, certified to the Court that she had read, and had due notice of the petition of Brown, and that she had no objection to the prayer of it.

And the guardian of Sarah Holman and Oliver Holman, minors and children of Oliver Holman, deceased, certified that they also had notice, and that they had nothing to allege against the prayer of the petition.

The Court, on hearing the petition, licensed and empowered the administratrix to make the deed. And in pursuance of this

order she executed a deed in conformity with the bond to Brown, the 10th March, 1824.

That this deed is inoperative is clear. It was executed by the administratrix under a decree or order of the Supreme Court in Massachusetts, and by virtue of a statute of that state. The proceeding, it is not pretended, was authorized by any law of Alabama. And no principle is better established than that the disposition of real estate, whether by deed, descent, or by any other mode, must be governed by the law of the state where the land is situated.

A Court of Chancery, acting in personam, may well decree the conveyance of land in any other state, and may enforce their decree by process against the defendant. But neither the decree itself, nor any conveyance under it, except by the person in whom the title is vested, can operate beyond the jurisdiction of the Court.

The Massacusetts Court, in granting this license to the administratrix, did not exercise Chancery powers. Neither the administratrix nor the minor heirs were made parties and required to answer, as a procedure in Chancery. It was a proceeding at law, informal and summary in its character. The administratrix only was required to execute the conveyance. By the laws of Alabama, she had no power to dispose of the real estate of her husband, as administratrix, except for the payment of the debts of the estate, under the sanction of law.

But the defendants insist that the title-bond given to Brown by Holman, for a part of the premises, constituted a good defence in the action; that, the consideration having been paid, Holman and his heirs held the property in trust for Brown and his assignees; and that a Court of Law will give effect to the trust, at least so far as to prevent the trustees from recovering the possession against the cestui que trust.

This doctrine seems to have been sanctioned, to some extent, in New York, in the cases of Foot and Litchfield v. Colvin and others, 3 Johns. Rep. 216; Jackson ex dem. Benson v. Matsdorf et al. 11 Johns. Rep. 91; Jackson ex dem. Sulye v. Moore, 16 Johns. Rep. 197. These decisions may have been influenced somewhat by the statute concerning uses in that state, which subjects the estate of the cestui que trust to execution. In one of the cases,

8

Spencer, Justice, giving the opinion of the Court, says, "Without the aid of the statute, I consider James Litchfield, if he advanced the purchase-money, as having an int..est liable to be sold on execution."

In the case of Jackson ex dem. Walton v. Leggett, 7 Wend. Rep. 377, the Court remark, "the legal estate must prevail." "The only exception to the rule is in the case of a resulting trust: in such case the trust may be proved by parol, and the estate of the cestui que trust may be sold on execution, and has been so far considered the property of the cestui que trust, as to be a defence in an action of ejectment."

This was the doctrine of the Lord Mansfield, in the case of Armstrong and others v. Peirse and others, 3 Bur. Rep. 1899. In Doe on the demise of Bristow v. Pegge, 1 Term Rep. 758, note a, he lays down the broad doctrine, "that a trust shall never be set up against him for whom the trust was intended;" and the other judges concurred.

It is known that that great judge had a strong leaning to the principles of equity in trials at common law. His successor seemed to be under a different influence; although he had been Master of the Rolls for some years. This equitable doctrine in a Court of Law was overruled in the case of Doe on the demise of Hodsden v. Staple, 2 Term Rep. 684. Lord Kenyon says, "Is it possible for a Court of Law to enter into the discussion of such nice points of equity? We have no such authority. Sitting in this Court, we must look at the record, and see whether a legal title is conveyed to the party claiming under these instruments: now, there is no colour for saying that these give any legal title. Without deciding, or presuming to think what a Court of Equity would do in this case, it is enough for me to say that we are to decide a legal question, and cannot enter into such an entangled equity." The other judges, except Buller, concurred with the chief justice.

In Doe on the demise of Shewen v. Wroot and others, 5 East Rep. 132, Lord Ellenborough said, "We can only look to the legal estate, and that is clearly not in the devisees, but in the heir at law of the surrenderor; and if the devisees have an equitable interest, they must claim it elsewhere, and not in a Court of Law. For as to the doctrine that the legal estate cannot be set up at

law by a trustee against his cestui que trust, that has been long repudiated." And this is the settled doctrine in England on this subject; and, with few exceptions, in this country. In the states where no Courts of Chancery are established, Courts of Law, in giving relief, of necessity, trench upon an equitable jurisdiction.

It is not perceived why a Court of Law should regard a resulting trust more than other equitable rights; and any attempt to give effect to these rights at law, through the instrumentality of a jury, must lead to confusion and uncertainty. Equitable and legal jurisdictions have been wisely separated; and the soundest maxims of jurisprudence require each to be exercised in its appropriate sphere. We are clearly of the opinion that the title-bond in question, constituted no defence in the above action.

Whether any title passed under the Alabama statute, is the last point to be considered.

The act authorized the administratrix of the late Oliver Holman, resident in the city of Boston, Massachusetts, to sell by Nathaniel Littlefield and Gorham Davenport, her attorneys in fact, the real estate of which the said Holman died seised, in the city of Mobile, " on such terms, and in such manner, as may be deemed most advantageous to his estate." " The second section authorized the administratrix, by her attorneys, to convey the premises to the purchaser." And the third section provided that before the sale the attorneys shall give bond with sufficient security for the faithful payment of the money received by them to the administratrix, " to be appropriated to the payment of the debts of the deceased."

Under this law, a sale was made; and a conveyance executed to Brown, by Sarah Holman and her attorneys in fact, the 24th April, 1824.

This act of the legislature, it is contended, is in violation of the constitution of Alabama; and, with the proceeding under it, is consequently void.

The first section of the second article of the constitution declares that "the powers of the government of the state of Alabama shall be divided into three distinct departments: and each of them confided to a separate body of magistracy, to wit: those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." And the second

section declares that "no person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

The passage of the statute, it is insisted, was a judicial act by the legislature, which the constitution inhibits.

On the part of the plaintiffs in error, a great number of acts of this character, by the Alabama legislature, shortly after the adoption of the constitution, are cited, to show a settled construction of that instrument. The defendants in error referred to reports by committees of the legislature, which maintained the unconstitutionality of these acts. And it is asserted and not contradicted, that since that report, under a conviction of its soundness, the legislature have passed no laws on the subject. A manuscript decision of a Circuit Court in Alabama, in the case of Campbell and Havre *v.* Scales and others, was read; but the question now under consideration seems not to have been raised. In almost all the states, laws of this description are common; and the titles to an immense amount of property depend upon their validity.

The phraseology of the constitution of Alabama in regard to the distribution of its powers, is somewhat peculiar; but it is not substantially different from the constitutional provisions of some of the other states. The third section of the Virginia constitution declares that "the legislative, executive, and judiciary departments shall be separated and distinct, so that neither exercise the powers properly belonging to the other."

Indeed, in all the state constitutions, the legislative, judicial, and executive functions are vested in different functionaries; and it would seem to follow that the powers thus specially given should be exercised under their appropriate limitations. The inhibition of the Alabama constitution contains, in terms, that which necessarily arises from the construction of the constitutions of other states.

In some cases it is difficult to draw a line that shall show with precision the limitation of powers, under our form of government. The executive, in acting upon claims for services rendered, may be said to exercise, if not in form, in substance, a judicial power. And so a Court, in the use of a discretion essential to its existence, by the adoption of rules or otherwise, may be said to

legislate. A legislature, too, in providing for the payment of a claim, exercises a power in its nature judicial; but this is coupled with the paramount and remedial power.

But, whatever difficulty may arise in certain cases, in regard to the exercise of these powers, there would seem to be little or none in the case under consideration.

The character of the act in question is essentially remedial. It contains no other feature. An authority is given to the administratrix to sell, in a particular manner, the property in dispute, for the payment of the debts of the intestate. The act does not determine the amount of the debts, nor to whom they are payable. It is proved, however, that the estate was insolvent. And it is conformably to the settled policy of Alabama, to apply the real estate of a deceased person in payment of his debts. The case under consideration, the administratrix residing in Massachusetts, and being desirous of selling the property through her attorneys in fact, was not embraced by the general statute on the subject; and hence the necessity of the special authority.

Now, how does this act differ in principle from the general law on the same subject? The general law was passed from the knowledge which the legislature had of its expediency and necessity. The special law was passed from a knowledge of its propriety in the particular case. The power exercised in passing the special as well as the general law, was remedial.

Under the general law, application is required to be made by the executor or administrator to the County Court, representing that the personal estate is not sufficient to pay the debts of the deceased: that he left real estate, particularly describing it, and praying that it may be sold, &c. A notice is required to be given to the heirs and devisees, &c., who are to answer, &c., and the Court on the hearing are authorized to decree a sale of the estate, on the petitioner's giving bond, &c.

The mode of procedure under the general law was required by the legislature, from motives of expediency; but it by no means follows that it was the only mode they could adopt. In some of the states, the heirs or devisees are not required to be made parties by the administrator. His application is ex parte to the Court; which orders a sale of the real estate to pay the debts of the deceased, where the personal estate is insufficient. And

no doubt can be entertained that the legislature may authorize the administrator, by a general or a special act, to sell lands to pay debts, where the personal assets are exhausted, without any application to the Court. And in such case the administrator would act on his own responsibility, and be accountable to the creditors and heirs for the correct performance of his trust, in this, as in other parts of his duty.

This is a question of power and not of policy; and on such a question we cannot test the act by any considerations of expediency. Whether the act may be open to abuse, whether it be politic or impolitic, is not a matter now before us: but whether the legislature had power to pass it.

A report in the senate of Alabama on this subject says; " Upon the death of the ancestor, the real estate owned by him descends to and vests in his heirs, and the title thus vested cannot be divested without some proceeding to which the heir is a party. A minor could not legally assent to the passage of a law authorizing the sale of his real estate; but would have the right to affirm or disaffirm the sale when he arrived at lawful age."

This is laid down on general principles, and without reference to the constitution of Alabama  As a legal proposition, it is wholly unsustainable.

In the first place, it is contrary to the general practice of many of the states, and to the received notions of the profession on the subject. Titles in Ohio and in many other states, to a vast amount of real property, rest upon sales of executors and administrators under the order of a Court, without making the heirs parties; and it is believed that a doubt of the validity of such titles, where the proceedings have been regular, has never been entertained or expressed. These titles have been contested in State Courts and in this Court; and a defect of power to convey a good title in the mode authorized, it is believed, has never been objected.

A course of proceeding so extensive, involving interests so great, and which has been subjected to the severest legal scrutiny, is no unsatisfactory evidence of what the law is.

But, on principle, this proceeding is sustainable. On the death of the ancestor, the land owned by him descends to his heirs. But how do they hold it? They hold it subject to the payment

of the debts of the ancestor, in those states where it is liable to such debts.

The heirs cannot alien the land to the prejudice of creditors. In fact and in law they have no right to the real estate of their ancestor, except that of possession, until the creditors shall be paid.

As it regards the question of power in the legislature, no objection is perceived to their subjecting the lands of the deceased to the payment of his debts, to the exclusion of his personal property. The legislature regulates descents, and the conveyance of real estate. To define the rights of debtor and creditor is their common duty. The whole range of remedies lies within their province. They may authorize a guardian to convey the lands of an infant; and indeed they may give the capacity to the infant himself to convey them. The idea that the lands of an infant which descend to him, cannot be made responsible for the payment of the debts of the ancestor, except through the decree of a Court of Chancery, is novel and unfounded. So far from this being the case, no doubt is entertained that the legislature of a state have power to subject the lands of a deceased person to execution in the same manner as if he were living. The mode in which this shall be done is a question of policy, and rests in the discretion of the legislature.

The law under which the lot in dispute was sold decides no fact binding on creditors or heirs. If the administratrix and Brown have acted fraudulently in procuring the passage of this act, or in the sale under it, relief may be given on that ground. But the act does nothing more than provide a remedy, which is strictly within the power of the legislature.

The judgment of the Circuit Court is reversed, and the cause remanded for further proceedings, in accordance with this opinion.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the southern district of Alabama, and was argued by counsel. On consideration whereof, It is now here considered, ordered, and adjudged by this Court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs; and that this cause be, and the same is hereby, remanded to the said Cir-

cuit Court, with directions for further proceedings to be had therein, according to law and justice, and in conformity to the opinion of this Court.

*Gustavus Beall et al.*

v.

*The Lessee of Holman et al.*

This case was also brought before the Court by a writ of error to the Circuit Court for the northern district of Alabama, on substantially the same grounds as those considered in the above opinion. There is no material difference in the facts on which the judgment of the Court rests, between the two cases. The judgment of the Circuit Court in this case is also reversed; and the cause remanded for further proceedings.