## MILES *v.* STEVENS.

Where an article of agreement for the sale of lands contained, on the part of the vendor, the following stipulation: " The said A. hereby agrees to sell unto the said B. and C., their heirs and assigns, one undivided half part of two hundred acres of land, situate on Elk Creek, in the county of Erie, and including the mouths of said creek; said two hundred acres to be cut off the lands of the said A. by lines hereafter to be designated by the said A., B. and C., or a majority of them, so as to embrace within said two hundred acres the lands at the harbour of said Elk Creek best suited for the site of a city intended to be located on the same:"—*Held,* that these words were not only a description of the premises agreed to be sold, but also a representation by the vendor, *that there was a harbour there,* which, being the assertion of a material fact, would affect the contract, and attaint it with fraud, if it were proved to be untrue.

If, in such case, the court had submitted the construction of the article of agreement to the jury, and instructed them that they might infer from it alone, misrepresentations by the vendor, *it would have been error;* but, where other evidence had been given, to submit the said agreement, with all the other evidence in the cause, to the jury, and to instruct them " to weigh all the facts in the case, and to say, whether they tend to prove that the vendor misrepresented the condition of the mouth of Elk Creek, relative to a harbour," and if they believed the vendor had practised a fraud upon the vendees, in relation to the existence of a harbour at that place, that then such fraud would entirely vitiate the contract, *is not error.*

Where a contract is made under a mistake, or in ignorance of a material fact, one which is of the very essence of the contract, it is voidable and relievable in equity. And *it seems,* that this rule applies not only to cases where there has been studied suppression or concealment by one side, which would amount to actual fraud, but also to many cases of innocent ignorance and mistake on both sides.

Where a contract was made under the persuasion that the Legislature of Pennsylvania and the Congress of the United States would pass laws, the one for the termination of the Erie Extension of the Pennsylvania Canal at the mouth of Elk Creek, and the other making appropriations for a harbour at the same point; and where the main and only inducement to entering into this contract was, the mutual expectation of the parties that the land immediately adjacent to the mouth of said creek would become the site of a great city, as the direct consequences of the improvements thereafter to be made at that place by the general and state governments; it was *held,* that where the basis and inducement to making such contract utterly failed, without any fault

imputable to any person, it would be contrary to equity to compel the payment of the purchase money.

Where a deed is sought to be made effectual, on an event unexpected to both parties, the party seeking to enforce it is unjust and inequitable in his demand.

Where parties to a contract have presupposed some facts or rights to exist, or that they will thereafter exist, as the basis of their proceedings, which in truth do not exist, or are prevented from happening by unforeseen causes ending in mutual error, under circumstances material to their character and consequences, such contract, on general principles, is inoperative and invalid.

If a mistake have been made on the trial, either in the admission or rejection of evidence, or in the charge, which, it is apparent, did not prejudice the case of the exceptant, it is not error, for which a reversal will be decreed.

Evidence, that there was no harbour at the mouth of Elk Creek, and not the slightest probability that one would be constructed, was relevant and admissible; as it went to contradict the representation of the vendor, that there was a harbour there.

In an action to recover a part of the purchase money of lands sold, want of title in the vendor to the property, if proved, is a complete defence to the action in law and in equity, and evidence to show it is admissible.

Where evidence has been admitted, whether it be secondary or not, or whether it were properly or improperly admitted, becomes immaterial, if the Court, in their charge, rule out the point of defence to which such evidence was applicable.

If the Court allow a party to take out a portion of a deposition and part of a sentence, leaving what stands to convey a different meaning from what it would do with the context, it is palpable error.

The journal of the House of Representatives of the United States, together with a letter of the Secretary of War, and a report of a Topographical Engineer, reported to the House in pursuance of a resolution, if properly authenticated, are evidence to prove, that there was no harbour at the point designated, and that it was practicable and in the contemplation of the government to make an artificial harbour there. But they are not evidence to prove, that third parties had knowledge of the facts contained in them, merely because they were the acts of authorized and accredited agents of the government, and such third parties are not bound to take notice of them.

The mere expression of opinion by a witness who was acquainted with Lake Erie and the harbours thereof, was not evidence of the practicability of making a good artificial harbour at the point designated, similar to those already constructed on the lake. The fact, that a good harbour could be made there, was evidence; but proof as to harbours and their construction elsewhere, was not admissible.

*May* 15 and *June* 26. This was an action brought in the District Court of the County of Lancaster, to September Term, 1844, by the plaintiff in error, who was plaintiff below, against Thaddeus Stevens, surviving Charles Ogle, deceased, upon the covenant of the defendant, to pay to the plaintiff five thousand dollars on the first day of August, 1837, in the following article of agreement:—

"Articles of agreement, made March 3, 1837, between James Miles, of the county of Erie and state of Pennsylvania, of the first part, and Thaddeus Stevens and Charles Ogle, both of the state aforesaid, of the second part, as follows: The said Miles hereby agrees to sell unto the said Stevens and Ogle, their heirs and assigns, one undivided half part of two hundred acres of land, situate on Elk Creek, in the

county of Erie aforesaid, and including the mouths of the said creek; said two hundred acres, to be cut off the lands of said Miles, by lines hereafter to be designated by said Miles, Stevens and Ogle, or a majority of them, so as to embrace within said two hundred acres the lands at the harbour of said Elk Creek best suited for the site of a city intended to be located n the same, by said Miles, Stevens and Ogle. In consideration whereof, said Stevens and Ogle hereby agree to pay unto said Miles, on the first day of August next, the sum of five thousand dollars. And further, to allow said Miles to retain out of the purchase money, arising from the sale of lots in said city, the sum of ninety-five thousand dollars. The said Miles hereby agreeing to look to no other fund for payment of said ninety-five thousand dollars, but the moneys that may be received from the sale of lots in said intended city. It being distinctly understood, that said Stevens and Ogle, their heirs, executors, administrators or assigns, are to be in no event liable, or held responsible to said Miles, his heirs or assigns, for said sum of ninety-five thousand dollars. It is further agreed by and between said Miles, Stevens and Ogle, that after said Miles shall have received the aforesaid five thousand dollars of the said Stevens and Ogle, and shall also have retained out of the moneys that may come into his hands, arising from the sale of lots in said city, the sum of ninety-five thousand dollars as before mentioned, he shall execute a deed, assigning and conveying, clear of all encumbrances, unto said Stevens and Ogle, their heirs and assigns, the one undivided half part of all lands and lots then remaining unsold, part and parcel of said two hundred acres before described, and also one half of all the purchase money due, and to grow due for sales of lots, over and above said ninety-five thousand dollars above mentioned. It is also further agreed between said parties, that if the said ninety-five thousand dollars shall not be received by said Miles, within ten years from the date hereof, in that event, the said Stevens and Ogle, their heirs and assigns, shall relinquish all claim to any interest in said two hundred acres of land; and the same shall remain to the said Miles, his heirs and assigns, as fully as if this agreement had not been made, unless said Stevens and Ogle shall, at any period before the expiration of said ten years, prefer to pay, and do pay unto said Miles, his heirs and assigns, the balance that may be due to said Miles, his heirs or assigns, of the fifty thousand dollars, the estimated valuation of the one half of said two hundred acres of land. It is further agreed, that the grain now in the ground shall remain to said Miles, as also any spring crop that he may put out. It is further

agreed, that said Miles shall *not sell or dispose of his interest* in said two hundred acres of land, until said first day of August next."

The defendant pleaded payment, with leave to give the special matter in evidence, on which issue was joined. Of this special matter the defendant gave notice.

The plaintiff gave in evidence the article of agreement, the copy of which, in his possession, was in the handwriting of Charles Ogle, and rested.

The defendant proved, by the depositions of Irwin Camp, Daniel Dobbin, and James D. Dunlap, Esq., taken in December, 1844, that there was no natural or artificial harbour for the shipping navigating Lake Erie, at the mouth of Elk Creek, and that near the mouth the bottom was rocky.

The depositions also proved, that the mouth of the creek could be dug out and a harbour made there, as at the mouth of any other creek; that the father of the plaintiff was the reputed owner of the land, agreed by the article to be conveyed, and that the deponent had searched the records of Erie county, to find a deed from him to his son James Miles, the plaintiff, and could not find such deed; that the land contracted for was not worth more than $25 per acre; that the Erie Extension of the Pennsylvania Canal was located in the borough of Erie, in the fall of the year 1838; that there is no outlet lock from this canal at Elk Creek, from the mouth of which, it is distant about two miles and one half. Having given these depositions in evidence, the defendant rested.

The plaintiff gave in evidence the following letters from Thaddeus Stevens, the defendant, and Charles Ogle :—

"*Gettysburg, August* 21, 1837.

"Dear Sir—When I found it impossible for me to visit the west *this summer*, as I *had intended*, I wrote to Judge Ogle to go on, and do such things in our joint names as might be mutually satisfactory. I have not since heard from him—I suppose he is now at Washington. It seems to me, it would be advisable not to have us [Ogle, Watts and myself] seen there, until after the next session of the Legislature. I have no doubt as to the *final location*.

"Yours,      Thaddeus Stevens.

"Jas. Miles."

Post-marked, "Gettysburg," and directed "To Mr. James Miles, Girard, Erie county."

"*Washington, February* 12, 1838.

"Dear Sir—I have deferred replying to your favour, until I would

hear definitely from Mr. Stevens, in relation to the Elk Creek affair. I have had several communications from him on the subject. In the first, he suggested the propriety of cancelling WITH YOUR CONSENT the whole concern. *In his last, he states he will be content with any arrangement you and I shall make, with a declaration, that it will not be convenient to pay any money before next autumn.* He says, the canal will certainly be located on the western route, and an outlet eventually will be made at Elk Creek, but believes the speculation a bad one, although it may turn out otherwise. *In my opinion, the mouth of Elk Creek will some day become a site of great importance,* but whether that day will arrive before the spring of 1847 is very doubtful, from the adverse change that has taken place within the last year, and which is likely to continue for an indefinite period. I trust it will not be taxing your justice and generosity too far, by asking an extension of *our* interest in the Elk Creek property, to the year 1850 ; and a grant of further time for payment of the hand money, say one half on the first day of November next, and the balance on the first of April, 1839. In regard to *the harbour,* I have great confidence that *we* will succeed in obtaining *an appropriation of* 35,000 dollars *this session.* The subject is now under consideration, and it will be unnecessary to forward *new petitions ;* they might *arouse the jealousy of the citizens of Erie, and cause them to remonstrate against the measure.* I had all the *old petitions on this subject hunted up* and handed to the member from your district, (Mr. Plummer,) who will present them to the House this day, when they will be referred to the appropriate committee. I will be glad to hear again from you as soon as convenient. Yours, very respectfully,

"CHARLES OGLE.

"Mr. J. Miles."

Post-marked, "Washington city, D. C. ;" franked by "C. Ogle ;" and directed "to James Miles, Esq., Girard, Erie county, Pennsylvania."

The plaintiff also proved by William Watts, Esq., a witness well acquainted with Elk Creek and the navigation of Lake Erie, that Elk Creek puts into Lake Erie about seventeen miles above the town of Erie ; that it is generally very shallow, and a rapid stream, having a great deal of fall, until within half a mile from its mouth ; and from that point to its junction with the lake, the water in it was deep dead water, from six to ten feet deep ; that its natural width was from one hundred to two hundred and twenty feet, and that it might be excavated to make it six hundred feet wide ; that at the mouth of the stream there was a bar of sand thrown up by the lake, on

which the water was very shallow; that when there was a freshet in the stream it would sometimes wash the sand-bar from its mouth, when the water then was from three to six feet deep; that this sand-bar could be removed, and a pier constructed, which would prevent it from filling up; that vessels very frequently come off the bar, and are lighted, and goods taken within the bar into the creek. There was a storehouse near the outlet, built in the meadow of the plaintiff; that the witness had known a vessel of two hundred tons burden built up the creek, launched there, and floated out in the freshet; that steamboats navigating Lake Erie draw, upon an average, eight feet of water, and sailing vessels from four to seven and a half feet; that the lockage of the canal from Elk Creek to Erie was very great; to the mouth of Elk Creek it would have been about the same; on the former route there are two aqueducts, one of eleven hundred feet, and one from nine hundred to a thousand feet. The difference in distance is thirteen miles and a half. The cost of constructing the canal to Erie was much greater than it would have been to construct it to the mouth of Elk Creek.

The witness also proved, that the plaintiff resided in the county of Erie; the defendant in the county of Adams, and Charles Ogle in the county of Somerset, when the article of agreement was executed; that the plaintiff was a farmer, and the defendant and Mr. Ogle were lawyers by profession; that the plaintiff and defendant were seen by the witness in Harrisburg, the last of February and the beginning of March, 1837; that the state legislature was in session; that the plaintiff resided on the land, at the mouth of Elk Creek, and was known by the witness to have resided there from the year 1829; that he had made extensive improvements upon it, having built two dwelling houses, a large barn, double crib and wagon shed, and cleared one hundred and fifty acres, and he resided himself near the mouth of Elk Creek. In answer to a question by the defendant, he said he had never seen the defendant in the county of Erie. This was the evidence given in the cause.

On the trial, the following bills of exception were taken:—

The plaintiff objected to the depositions of Irwin Camp and Daniel Dobbin, on the ground, that until some evidence was given to prove that the plaintiff had represented that there was, at the mouth of Elk Creek, a harbour for shipping navigating Lake Erie, these depositions were irrelevant. He also objected to particular parts of the depositions which he underscored. The court overruled the objection and admitted the depositions in evidence.

The deposition of Daniel Dobbin contained the following sen-

tence :—" *There is no harbour there now, and deponent never considered there was much chance of making one. It is too limited, too small.*" This sentence was underscored and particularly objected to. The court rejected the words, "*and deponent never considered there was much chance of making one,*" and admitted the deposition with the rest of the sentence.

The plaintiff also objected to the deposition of James D. Dunlap, for the same general reason; and also, particularly, to the following sentence, which he underscored :—"*Old Mr. Miles, the father of the plaintiff, was the reputed owner of the land. I searched the records of Erie county to see if there was a conveyance from him to James Miles, but neither the recorder or myself could find any.*" The court overruled these objections, and admitted the deposition with this sentence. The admission of these depositions formed the first three bills of exception, which were assigned for error here.

The plaintiff offered the journal of the House of Representatives of the Congress of the United States, for the year 1833 and 1834, containing a resolution of the House, calling on the Secretary of War for a copy of the report and survey made by Col. Kearney, United States Engineer, of a harbour at the mouth of Elk Creek and Lake Erie, and the report made in pursuance of the resolution, published by authority, with proof that these journals and documents, as printed, were furnished to Mr. Heister, a member of that House, by the clerk thereof. The report was of a survey of "*a harbour at the mouth of Elk Creek on Lake Erie,*" and the estimate of $35,000 "*for the purpose of removing the obstructions to the navigation and forming a harbour there,*" with a description of the work, and a strong recommendation of it for the commerce of the lake. The plaintiff also offered this evidence in connection with the letters of the defendant and Charles Ogle, and also without so much of the report as referred to the action of the board of Internal Improvements. To these several offers the defendant objected, and the court sustaining the objection overruled the evidence ; and these formed the fourth, fifth, and sixth bills of exception, which were assigned for error here.

The plaintiff offered to prove by Mr. Watts, that all the harbours of Lake Erie are constructed artificially, and that a harbour similar to these might be constructed at the mouth of Elk Creek, by the removal of the bar, and the erection of similar works for the protection and preservation of the harbour. This evidence, on objection, was rejected by the court.

The plaintiff offered to ask the witness, "Whether a good artificial arbour could be constructed at the mouth of Elk Creek?" which

was objected to by the defendant. The court said, " The proper course of examination would be, to inquire of Mr. Watts with respect to the locality, the ground on each side, and all other features pertaining to a harbour," and the court overruled the question.

The plaintiff proposed to ask the witness, "If the creek were enlarged, (as he said it might be,) the bar removed, and the pier made, would it be a good harbour for vessels navigating Lake Erie?" This question was overruled and the evidence rejected.

The plaintiff proposed the following question to the witness:— " Would a harbour six hundred feet wide, from eight to ten feet deep, constructed at the mouth of Elk Creek, admit the vessels usually navigating Lake Erie, so as to protect and conduct the commerce upon it?" This question, on objection, was also overruled.

The plaintiff also offered to prove that Messrs. Babbitt and Miller were members of the legislature, from the county of Erie, attending the session, when the article of agreement was made; that the former resided in the borough of Erie, and the latter within a few miles of Elk Creek. This offer was rejected and the evidence overruled, and the rejection of these offers and evidence was the subject of the seventh, eighth, ninth, tenth, and eleventh bills of exception, all of which were assigned for error: the errors assigned corresponding in number with the bills of exception.

Errors were also assigned in the answers of the Court to points submitted on the part of the plaintiff and defendant respectively.

The plaintiff's points and these answers were as follows:—

Second point.—That the letter of Charles Ogle, of the 12th February, 1843, in which he says, "In regard to the harbour, I have great confidence that we will succeed in obtaining an appropriation of $35,000," is evidence to show, that the parties understood that the erection of works at the mouth of Elk Creek by the general government, was required in order to make a harbour at that place a perfect one; and in that case, putting into the agreement on which suit is brought the words, "so as to embrace within the said two hundred acres the land at the harbour of Elk Creek," is the mere description of the place for the site of a city, which the parties intended to locate; and these words, thus used in the agreement, furnish no evidence of fraud on the part of James Miles, although it is now proved, that without such works, there is no access to the harbour at the mouth of Elk Creek, and the plaintiff is therefore entitled to recover.

Answer of the court.—The letter mentioned in this point appears, by its date, to have been written nearly twelve months

after the agreement in question. It speaks its purpose plainly; and the jury must determine as to what it tends to prove. In relation to the words quoted from the agreement, it is for the jury weighing these, with all other facts in evidence, to say, whether they tend to prove that James Miles, the plaintiff, misrepresented the condition of the mouth of Elk Creek, relative to a harbour, or not.

Third point.—That the letter of Mr. Stevens of August 31, 1837, and also the letter of Mr. Ogle of February 12, 1838, furnish evidence of the fact, that they knew that there were no improvements at the mouth of Elk Creek; but also of the entire practicability of such improvements, and as contemplated by the parties, at the time of making the agreement on which suit is brought.

Answer of the court.—Of this matter, as a question of fact, the jury must judge, the letters being in evidence before them.

Fourth point.—If neither James Miles, or Thaddeus Stevens and Charles Ogle, knew, when they entered into the agreement of the third of March, 1839, whether a harbour at the mouth of Elk Creek would be made perfect by the appropriation of money by the general government, or that the Erie Canal would be made to terminate there, or that an outlet lock would be made there to connect it with the Erie Canal, and neither of said parties could know what would be the value of a site for a city, embracing the harbour at Elk Creek, no inadequacy of consideration or disproportion between the value of such site, and the sum agreed to be paid, would, in equity, bar the right to compel a fulfilment of the agreement, or prevent the plaintiff from recovering the $5000, and interest on the same, from August 1, 1837, and for which he brings suit.

Answer of the court.—If the fact assumed, that neither of the parties could know what would be the value of a site for a city at the mouth of Elk Creek, embracing a harbour, were correct, and if the parties entered into the contract, without being induced by the expectation that such a city would spring up there, and make the land of incalculable value to the proprietors, then, indeed, there might be ground for the conclusion that the inadequacy of consideration, or disproportion between the value of such site and the sum agreed to be paid, would not bar the right of the plaintiff, in equity, to compel a fulfilment of the agreement by the defendant. But if the jury believe that the building or growth of a city was the sole object of this contract, the practicability of which was entirely dependent upon public acts and events, which did not happen, as all the parties expected they would, and that the basis of the contract has wholly

c 2

failed, it would be inequitable and unjust to compel the defendant to pay the sum demanded in this action.

Fifth point.—Any statement made to the jury by Mr. Stevens, who appears to try his own cause, which is unsupported by proof, the jury is bound to reject and throw out of the case.

Answer of the court.—The statements of counsel in their addresses to the jury, whether pleading their own cause or that of others, are not evidence. This, I suppose to be the meaning of the fifth proposition ; and the truism applies equally to every counsel in the cause.

The defendant's points, and the answers of the court which were assigned for error, were as follows :

Second point.—That when a deed is sought to be made effectual on an event which is unexpected to both parties, a court of equity denies its authority. The party seeking to enforce it is unjust and inequitable in his demand, and this furnishes a valid objection to the adverse party.

Answer of the court.—Answered in the affirmative.

Third point.—That where parties have presupposed some facts or rights to exist, as the basis of their proceedings, which in truth do not exist, such contracts made in mutual error, under circumstances material to their character and consequences, seem, on general principles, invalid.

Answer of the court.—Answered in the affirmative.

Fifth point.—If the jury believe that the main value of the property sold, in the opinion of both sellers and buyers, was the expectation that the Erie Canal would terminate on said land, or that there would be an outlet into Lake Erie there, and that there was a harbour that would produce a city at the mouth of Elk Creek, and if such facts constituted the main value of said land, and all such facts and expectations failed, then plaintiff ought not to recover.

Answer of the court.—Answered in the affirmative, provided the jury believe that these circumstances, which constituted the basis of the contract, have been so changed by the course of public acts and events, that it is no longer possible that a city can be laid out or founded within the ten years mentioned in the contract.

Sixth point.—If plaintiff represented that there was a harbour at the mouth of Elk Creek, when in fact none such existed, or is likely to exist, and if such fact was the main inducement to the purchase by defendant, and if defendant was never in the county of Erie, but relied on plaintiff's representations, that plaintiff cannot recover, and the jury are at liberty to infer such representations from the evidence in the article itself.

Answer of the court.—If such misrepresentations as is herein stated have been proved to the satisfaction of the jury, the plaintiff cannot recover. The article is in evidence, and the jury will of course draw from it such inferences with respect to the representation of the fact of a harbour by James Miles, as its language, and especially the words of the stipulation which constitute his part of the contract, may seem to them to warrant.

In the general charge, the court said to the jury, " This action is brought against Thaddeus Stevens, the surviving joint contractor, (Charles Ogle, Esq., being dead, as before stated,) to recover the sum of $5000 mentioned in the agreement, as payable on the 1st of August, 1837, with the interest accruing thereon from that day. The defendant contends that this money ought not to be paid, and ought not to be demanded. First, because it is said there was fraud and misrepresentation on the part of the plaintiff, by which the defendant was misled, to enter into this contract; the imputed fraud consisting in the plaintiff pretending that there was a harbour at the mouth of Elk Creek, whereas no such harbour existed; and that he was the true owner of the lands lying at the mouth, and on both sides of the said creek near the mouth thereof, when he had in fact no good title to the land. Secondly, because the whole contract was founded on the supposition and belief of the parties, that the Erie Extension of the Pennsylvania Canal would terminate at the mouth of Elk Creek, and the government of the United States would make a large appropriation for the opening and establishing of a harbour at the mouth of the said creek, in consequence of which, a city would be built up at that place, and the land there become of immense value as a city plot; and because these events, not having occurred, neither the canal having terminated at the mouth of Elk Creek, nor any appropriation having been made to open and establish a harbour there, the basis of the contract is, and has been, wholly removed and destroyed. Wherefore it would be against equity and good conscience to enforce the same, by requiring the payment of the said $5000.

" As to the first point of this defence, it is undeniable that if there was fraud or imposition practised upon the defendant, by the plaintiff inducing the former to enter into this agreement, such fraud would entirely vitiate the contract, and the plaintiff, for that reason, could not recover. It is for the jury to say, whether there was or was not such a misrepresentation in regard to the facts of an existing harbour, or the plaintiff's title, as the defendant contends there was; and it must be decided by you according to the evidence, for fraud

must be proved, either directly or by such circumstances in the conduct of the party charged with it as are inconsistent with honesty and the principles of morality. Fraud has been defined to be any cunning deception, or artifice used to circumvent, deceive, or cheat another. This definition, though sufficiently descriptive of what may be called positive, actual fraud, where there is an intention to commit a cheat or deceit upon another to his injury, does not include the large class of implied or constructive frauds which are within the remedial jurisdiction of a court of equity. Fraud, in the sense of a court of equity, properly includes all acts, omissions, and concealments, which involve a breach of legal or equitable duty, trust or confidence justly reposed, and are injurious to another. And courts of equity will not only interfere in cases of fraud, to set aside acts done, but they will also, if acts have by fraud been prevented from being done by the parties, interfere and treat the case exactly as if the acts had been done. 1 Story's Equity, ch. 6."

On the second point stated, of what the court said, so much as follows was assigned for error in the twenty-first specification of error: "Now, if the parties had made the agreement in question, on the mistaken idea that the legislature of Pennsylvania and the United States had passed laws, the one for authorizing the canal to be extended to the mouth of Elk Creek, the other making appropriations for the harbour there; in such a case, there is no doubt but that the contract would be set aside, and the defendant be relieved in consequence of this mistake. The difficulty is to determine, whether the same principle applies to a mistake as to the future passage of these laws, with reference to which the agreement was made, and made in the confident assurance of all parties, that they would pass; so much so, that it is admitted, that without such expectation and assurance, it would not have been made at all. I believe the case, in this aspect, is a novel one, though that of Quick and Stuyvesant, in 2 Paige, 84, resembles it essentially. The acts to which the parties to this agreement all looked forward, were public acts of independent governments. That they did not pass, as was expected and desired by the parties, is not imputed or imputable, from any thing we have heard, to the negligence of the defendant. The contract was made in contemplation of the passage of such acts; and the advantages which they all hoped to enjoy were entirely dependent upon the establishment and growth of a city at the mouth of Elk Creek, which, without those acts passed, is as much an impossibility, as if that creek ran down into Lake Erie through a narrow and lengthened ravine three hundred feet deep, and were bounded at the

mouth, on either side, by a precipitous bluff facing the lake, three hundred feet high. As to the equity, the real justice of this matter, if by the failure of these acts of government, the entire basis of the contract in question, ' the efficient cause of concoction,' is now as completely non-existent and impossible, and the purpose and object of the parties rendered as impracticable, as if they had contracted under a mutual and innocent mistake, believing that the acts had already been passed, I cannot see any essential difference in the justice of demanding the money sued for, in the one case and in the other.

" The instruction of the court upon this head, therefore, is, that if the jury believe that the main and only reason for this contract was the mutual expectation of the parties, that the land immediately adjacent to the mouth of Elk Creek was about to become the site of a great city, as the direct consequence of the Erie Canal being taken by the authority of the government of Pennsylvania to that point and terminating there; and of an appropriation of the general government for opening and establishing a harbour, and that this event is no longer morally possible, the canal having been extended to the borough of Erie, seventeen miles distant from the mouth of Elk Creek; then, as the basis of the contract has utterly failed for that reason, if the jury so believe, I am of opinion, that it would be inequitable to enforce the payment of the $5000, and that the plaintiff ought not to recover."

In answer to points put by the plaintiff and defendant on the subject of the plaintiff's title, the court said:—

" 8. The only evidence of title is that of his continued residence on the premises since 1829, and certain improvements made by him, by clearing about two hundred acres of land, and erecting two dwelling-houses, a barn, and other buildings. This settlement and improvement gives him—if the land be vacant—a settlement and improvement right, which he may perfect by warrant and survey, in preference to any other applicant, under the ' act for the sale of the vacant lands, within this Commonwealth,' passed 3d April, 1792. As the plaintiff was not obliged by the agreement to make a deed to the defendant, until he received the $5000, and also the $95,000, out of the city lots to be sold, unless within ten years the defendant and Charles Ogle should pay to him the balance that might be due to him, of $50,000, the estimated valuation of the one half of the said two hundred acres of land; so far as title may be necessary to sustain this suit, the inchoate right by settlement and improvement, as above explained, is sufficient: inasmuch as the plaintiff

cannot be called upon by the defendant to make and convey a title to him, before the defendant performs what the agreement requires him to do, previously to such a requisition upon the plaintiff."

The eleven bills of exception were numerically assigned for error; and the answers of the court to the plaintiff's second, third, fourth, and fifth, and to the defendant's second, third, fifth, and sixth points, numbering from twelve to nineteen, both included. The nineteenth and twentieth specifications of error were as follows:—

" 19. The court erred, in their answer to the sixth point, submitted by defendant, and in leaving to the jury the determination of the question, whether any misrepresentations, as stated in said point, had been made to plaintiff or not—when in fact and in truth, there was no evidence whatever, that such misrepresentations had been made at any time; and in referring to the jury the construction of the article of agreement, and in telling them that they might infer from it misrepresentations by plaintiff.

"20. The court erred, in that part of their general charge in which the court say, 'It is for the jury to say, whether there was, or was not, such a misrepresentation in regard to the facts of an existing harbour, or the plaintiff's title, as the defendant contends there was.' "

The twenty-first specification of error, was of the general charge, as above stated.

*Ford* and *Penrose*, for the plaintiff in error.

*Frazer* and *Jenkins*, contrà.

*August* 3. ROGERS, J.—This is an action of debt on an article of agreement, between James Miles and Thaddeus Stevens, who survived Charles Ogle, to recover the sum of five thousand dollars with interest, payable the 1st of August, 1837. The execution of the instrument is admitted by the defendant, who contends that he ought not to be compelled to pay the money; first, because there was fraud or misrepresentation on the part of the plaintiff; second, that the contract was entered into under an entire misapprehension and mistake of material facts; and, third, that the plaintiff has no title to the property he undertook to sell. It is believed that these grounds embrace the whole case.

The first point, viz., that there was fraud and misrepresentation on the part of the plaintiff, is a question of fact, which was properly left, and has been passed upon by the jury. It is based on the construction of that part of the agreement in the following words.— " The said Miles agrees to sell to the said Stevens and Ogle, their

heirs and assigns, the undivided half part of two hundred acres of land situate on Elk Creek in the county of Erie, including the mouth of said creek; said two hundred acres to be cut off the lands of said Miles, by lines hereafter to be designated by said Miles, Stevens, and Ogle, or a majority of them, so as to embrace within said two hundred acres *the lands at the harbour of said Elk Creek*, best suited to the site of a city, intended to be located on the same, &c." The defendant contends that the expressions, "the lands at the harbour of Elk Creek," contain, and was so intended, a representation that there was a harbour there; whereas, the plaintiff insists that it is a mere description of the plan for the site of a city, which the parties intended to locate there. That it may be considered a part of the description of the premises sold and designed for a particular and declared purpose, may be true; but I do not consider this view of the case as inconsistent with the allegation, that it also contains the assertion of a material fact, which, if untrue, will affect the contract, and attaint it with fraud. It is unquestionably the natural interpretation of the language used, that the vendor, who alone, as appears by the evidence, was acquainted with the premises, intended to assert that there was an existing harbour, communicating with the lake, and accessible to it, so as to be used by vessels of some description navigating those waters, and whether of the larger or smaller class, perhaps, would be immaterial. Indeed, the point now assumed appears to have escaped the notice of the parties on the trial; for it does not seem that they requested a specific direction, that the article contained nothing more than a description of the *locus in quo*, although it is incidentally mentioned in the plaintiff's second point. Neither plaintiff nor defendant desired the court to construe the article in this aspect; but they have thrown themselves upon the jury to determine from a view of all the testimony, whether there was a false representation, and if so, whether the defendant was deceived by it; the situation and condition of the premises being well understood and known, as the plaintiff contends, to all the parties to the contract. In the answer to the plaintiff's second point, that the letter of Charles Ogle, of the 12th February, 1843, in which he says, "In regard to the harbour, I have great confidence that we will succeed in obtaining an appropriation of $35,000," it is conclusively shown that the parties understood, that the erection of works at the mouth of Elk Creek by the general government, was required, in order to make a harbour at that place a perfect one; and in that case putting into the agreement on which suit is brought the words, "so as to embrace within said two hundred acres the lands

at the harbour of Elk Creek," as the mere description of the plan for the site of a city, which the parties intended to locate; and these words, thus used, furnish no evidence of fraud on the part of James Miles, although it is now proved, that without such works, there is no access to the harbour at the mouth of Elk Creek. The court very properly say, " that the letter mentioned in this point appears by its date to have been written nearly twelve months after the agreement in question. It speaks its purpose plainly; and the jury must determine as to what it tends to prove. In relation to the words quoted from the agreement, it is for the jury, weighing them with all the facts in evidence, to say, whether they tend to prove that James Miles, the plaintiff, misrepresented the condition of the mouth of Elk Creek, relative to a harbour, or not." A harbour in Elk Creek, but inaccessible from the lake, never entered into the contemplation of the parties; for such a harbour, if harbour it may be called, would be useless for the purposes of the contracting parties. There is no doubt they looked to the lake trade, which, it was supposed, would render the intended location valuable as a mart for commerce. So in answer to the defendant's sixth point. " If such misrepresentation, as is here stated, has been proved to the satisfaction of the jury, the plaintiff cannot recover. The article is in evidence, and the jury will of course draw from it such inferences, with respect to the representations of the fact of the harbour, by James Miles, as its language, and especially the words of the stipulation, which constituted his part of the contract, may seem to them to warrant." And in the charge, " that if there was fraud or imposition practised upon the defendants by the plaintiff, inducing the former to enter into the agreement, such fraud entirely vitiated the contract. It was for the jury to say, whether there was, or was not, such a misrepresentation in regard to the facts of an existing harbour." In the charge of the court, and in the answer to the points, which I have carefully examined, I have failed to discover any error of which the plaintiff has any reason to complain. If injustice has been done, it is not by the court, but the jury; a mistake, which, if made, we cannot correct. The plaintiff complains that the court referred the construction of the article to the jury, and in telling them that they might infer from it misrepresentation by the plaintiff. This is not dealing fairly, for the court did not say that the jury might infer misrepresentation from the article itself, which would be a blunder, but they leave the fact of fraud and misrepresentation to be decided on all the evidence. If the court should have instructed them, and we think they might with propriety have done so, that the articles

contained an allegation by the plaintiff, which was proved to be untrue, that there was a harbour at that point, the wrong was to the defendant, and not the plaintiff.

Second Point.—That the contract was entered into under a mistaken apprehension of facts. It is a general rule, that when an act is done, or contract made under a mistake or ignorance of a material fact, it is voidable, and relievable in equity ; and the rule applies not only to cases where there has been studied suppression or concealment of facts, by the one side, which would amount to fraud, but also to many cases of innocent ignorance, and mistake on both sides. It is true, that it is not every mistake which will enable the party to avoid the contract ; for, to have this effect, it must be of its essence, the *sine qua non* of the contract, or as it is expressed, the efficient cause of concoction. These principles pervade our equitable jurisprudence, and are supported by a train of authorities which it is useless to cite, as they are well illustrated and explained by Mr. Justice Story, in his Equity Jurisprudence, sec. 140, 141, &c. If, therefore, the agreement in question was made under a mistaken impression, that facts essential to the contract did exist, or, which is the same thing, would afterwards exist, and they were prevented, by causes over which the parties had no control, it is relievable against in equity. We perceive no distinction either in principle or authority, where the parties contract, either with a view to existing facts, or facts merely in contemplation between the parties defendant, on future events or contingencies. In either case, when the basis of the contract fails without the assent of the parties, to attempt to enforce the agreement is inequitable.

Thus, in ———— 2 Paige, 84, it is ruled, that where, from a defect of the common law, want of foresight of the parties, or other mistake or accident, there would be a failure of justice, it is the duty of a court of equity to supply the defects, or furnish the remedy. And therefore it was ruled, that where one person conveyed land to another for the purpose of opening a street in the city of New York, and there was no other consideration for the conveyance, but the benefit which the grantor was to derive from the opening of the street, and by *subsequent events*, beyond the control of both parties, the street could not be opened, a reconveyance of the land was decreed. This case, although not directly in point, bears a strong analogy here, and the reasoning of the chancellor is based on principles applicable to this case. If, therefore, the contract in question, as the jury have found, was made under the mistaken idea that the legislatures of Pennsylvania and the United States would pass laws,

D

the one for authorizing the canal to be extended to the mouth of Elk Creek, the other making a harbour there; that the main and only reason of the contract was the mutual expectation of the parties that the land immediately adjacent to the mouth of Elk Creek was about to become the site of a great city, as the direct consequence of the improvements thereafter to be made, which utterly failed, without any fault imputable to any person, it would be contrary to equity to compel the payment of the purchase money. The only doubt which attends this part of the case is, to ascertain the intention of the parties as to the first payment of $5000, that is, whether, as has been strenuously contended, Messrs. Stevens and Ogle agreed to run the risk of the location of the canal at that point, and a subsequent appropriation by the government of the United States of an amount sufficient to make a commodious artificial harbour suited to accommodate the commerce of the lake. For, if that was the contract, the defence utterly fails; as, whatever might be the termination of the proposed location of a city, a prospect which seems to have dazzled the eyes of all parties concerned, the vendees would have to pay for the chance of the enormous profits which it was hoped, and confidently believed, they would reap from the speculation. This view of the case is not without difficulty; but after a careful examination, we have come to the conclusion that this was not the intention, and I have been influenced in arriving at this result, by the consideration, that the construction contended for would compel the defendant to pay for moonshine the large sum of $5000, without its appearing that the plaintiff received the least injury, or the defendants the slightest benefit, from the contract. Miles agrees to sell to Stevens and Ogle the undivided half of two hundred acres of land. In consideration whereof, Stevens and Ogle agree to pay, on the first of August, the sum of $5000. And further, to allow Miles to retain out of the purchase money arising from the sale of the lots in a city which it was intended they should lay out, the sum of $95,000. The whole amount of the purchase money was $100,000, to be paid by Stevens and Ogle in the manner set out in the agreement. Of this, the $5000 now in suit constituted a part. There is nothing in the agreement which clearly indicates that it is put on a different footing from the other payments, except as to the time and manner it is to be paid. As it is part of the purchase money, there is no reason for making any distinction between the respective amounts which it is agreed they, in a certain event or contingency, are bound to pay, or what the plaintiff may retain. Had it been the design that this money was to be

paid at all events, for the chance of the speculation or participation in the profits, it would have been easy to have said so, by using terms specific and unambiguous; but there is nothing which plainly distinguishes, in this particular, this sum from the payments which all together make up the purchase money. The sum which they agreed to give is enough, in all conscience, without resorting to the conjecture that they were so moonstruck as to be willing to give so large a sum for the right to share the anticipated gains, which it was fancied would arise from the location of the intended city. We see nothing wrong in the charge, or the answer to the points. The charge is clear and explicit, and has put the case on the true issue. We entirely agree with the instructions, that if the jury believe that the main and the only reason of the contract was the mutual expectation of the parties that the land immediately adjacent to the mouth of Elk Creek was about to become the site of a great city, as the direct consequence of the Erie Canal being taken by the authority of the government of Pennsylvania to that point, and terminating there; and of an appropriation by the general government for opening and establishing a harbour; and that this event was no longer possible, the canal having been extended to the borough of Erie, seventeen miles from the mouth of Elk Creek, the basis of the contract has utterly failed, and it would be contrary to equity to enforce payment of any part of the purchase money. If the building and growth of a city was the sole object of the contract, the practicability of which was entirely dependent on future acts and events, which did not happen as all the parties expected they would, and that the basis of the contract has wholly failed, it would be unjust to compel the defendant to pay the money demanded in this action. When a deed is sought to be made effectual, on an event unexpected to both parties, the party seeking to enforce it is unjust and unequitable in his demand. And when parties have presupposed some facts or rights to exist, or that they will hereafter exist, as the basis of their proceedings, which in truth do not exist, or are prevented from happening by unforeseen causes ending in mutual error, under circumstances material to their character and consequences, the contract is, on general principles, inoperative and invalid. Moreover, the court would not have been justified in stating to the jury, that there was not such a case as is stated in the defendant's point.

3. Next, as to the title which the plaintiff undertakes to sell. In answer to the plaintiff's sixth, and the defendant's eighth point, the court instruct the jury that the plaintiff was not bound to tender a

deed before suit brought, or in the first instance to exhibit his title. And further, that the title of plaintiff, as given in evidence, of a continual residence on the premises since 1829, and certain improvements made by him, by clearing about two hundred acres of land, and erecting two dwelling-houses, a barn, and other buildings, constituted a right by settlement and improvement, sufficient to sustain the suit. This was a direction highly favourable to the plaintiff, certainly as much so as he had any reason to expect, as it deprived the defendant of his third ground of defence. It follows, therefore, that even admitting the admission or rejection of evidence bearing on this point was error, no injury was done to the plaintiff, and there is no reason for a reversal of the judgment. We have often ruled that we will not reverse for a mistake on the trial, whether in the admission or rejection of evidence, or to the charge, when it is apparent that it did not prejudice the case of the exceptant.

Having disposed of the general heads on which the case turns, we must now examine the bills of exception.

1. This is an exception to the admission of certain *depositions*, which were evidence for the purpose of contradicting the representation of the plaintiff that there was a harbour at the mouth of Elk Creek, by showing there was none there, nor was there the slightest probability that any would be made. The evidence, so far from being irrelevant, was pertinent to the issue, and of great consequence as having a direct bearing on one of the principal points of defence.

The court properly discriminates between the knowledge of the witness and his opinion, merely suffering the former to go to the jury, and excluding the latter.

The deposition in the second and third bills was excepted to, for the same reason as above, with this addition, that the party cannot take out a portion of the deposition and part of a sentence, leaving what stands to convey a different meaning from what it would do with the context. That the evidence offered of title, so far as it is offered, is secondary, and that, in this action, the evidence on the subject of title is immaterial. From what has already been said, it will be perceived, that we do not consider the title of the plaintiff as immaterial. This is an action to recover part of the purchase money of a tract of land sold by the plaintiff to the defendants; and if it can be shown that the plaintiff has no title to the property sold, it is a complete answer, both in law and equity, to the plaintiff's action.

Now, whether the testimony was secondary, we think immaterial;

for whether right or wrong, it is no cause of reversal, inasmuch as the court, in the charge, ruled out the defence, on the point of defect of title.    If it was true that the court allowed the defendant to take out a portion of the deposition, and part of a sentence, leaving what stands to convey a different meaning from what it would do with the context, it would be palpable error.    But that is not the case ; for, it seems to me, that the part admitted and the part excluded are very different, and wholly independent of each other, and that the one may be admitted, and the other excluded, without impairing the sense or varying the meaning of the witness.

The plaintiff offered in evidence the journal of the House of Representatives, together with a letter of Lewis Cass, secretary of war, and a report of James Kearney, topographical engineer, reported to the House in pursuance of a resolution, properly authenticated, together with certain letters of Messrs. Stevens and Ogle.    This was excepted to, the evidence rejected, and forms the ground of the fourth, fifth, and sixth bills of exception.

The object for which the evidence was offered, was to prove that at the time the agreement was made, Messrs. Stevens and Ogle knew that there was no harbour at the mouth of Elk Creek, and that, consequently, they were not deceived by the representations contained in the articles of agreement.    It must be conceded that it was pertinent to the issue, to prove knowledge of this important fact on the part of the defendant, for, if this was brought home to them, it would go very far to remove one ground of the defence.

The only objection is, to the medium of proof, and this raises the question, whether a citizen is affected with a knowledge of every fact which appears on the journal of either house of Congress, or our state legislature, and of the facts contained in the reports made under their authority.    It will be recollected that the report of Col. Kearney was made in 1834, and the contract in 1837.    It is now sought to affect the defendants with knowledge of the report, and every part contained in it.    It is not proved, that either Stevens or Ogle ever saw or heard of the report ; but it is intended to infer knowledge, because it was a matter of public authority, and made by orders of the government.    The object to be attained by the evidence offered, must be borne in mind, for it is not intended to deny, that documents of a public nature, and of public authority, are generally admissible in evidence, and that such documents are entitled to an extraordinary degree of confidence from the fact that it would be difficult, and sometimes utterly impossible, to prove facts of a public nature, by means of actual witnesses examined on oath ; such,

for example, as the passing of particular acts of Congress, and making public surveys and the like. The recital in the preamble of an act of parliament, of a public fact, is evidence to prove the existence of that fact. Rex v. Sutton, Maule & Selwyn, 532; Starkie on Ev. 197. The journals of the House of Lords have always been admitted as the evidence of their proceedings, even in ancient cases; and the journals of the House of Commons are also admissible. It is said, that the journals are not evidence of particular facts stated in the resolutions, which are not part of the proceedings of the House; as, for instance, a resolution, stating the existence of a popish plot, would not be evidence of the fact in a criminal case. Jones v. Randall, Cook R. 17; 5 T. R. 465; Doug. 572; Stark. Ev. 199; 16 Peters, 58.

In this country, in all public matters, the journals of Congress and of the state legislatures are evidence; and also the reports which have been sanctioned and published by authority. The publication does not make that evidence which intrinsically is not so; but it gives us, in a most authentic form, certain papers and documents. 16 Peters, 55.

That the public documents offered were evidence that there was no harbour at the point designated, and that it was practicable, and in the contemplation of government, to make an artificial harbour there, will not, and cannot be denied in the face of the authorities cited, and on which the plaintiff's counsel relied. Had they been offered for that purpose, their admission would not have been resisted, as the fact of the non-existence of the harbour is part of the defendant's case, and is, in truth, the object of all the testimony almost, given on his part. But it is offered with a different view, viz.: to prove knowledge on the part of the defendants, to be inferred solely from the circumstance, that it is an act of authorized and accredited agents, of which every individual in the community are bound to take notice. But this is a doctrine to which I cannot subscribe, as it would be subversive of every principle of justice, and would lead, without the least necessity, to much practical mischief. Miserable indeed would be our condition, if the citizens of our wide-spread confederacy were to be affected and controlled in their contracts, by a presumption of notice of a material fact, derived solely from a document of which he had never heard, and which, in many cases, the existence is not dreamed of by ninety-nine in a hundred. When we consider this question in a practical point of view, it is nothing more nor less than a gross absurdity, to suppose that every citizen of this state and of the United States knew there was no harbour at the mouth of Elk

Creek, merely because an engineer in the employment of the United States government stated the fact in a report made to the government. This is an attempt to misapply a general principle introduced with a different view, founded, in some measure, in the difficulty and indeed impossibility in some cases of proving facts of a public nature otherwise. Besides, as we have already seen, although it is general, it is far from being a universal principle. There are many exceptions. Thus it has been ruled, that a resolution stating the existence of a Popish plot would not be evidence of the fact in a criminal case; and why? because such evidence would be dangerous to the accused, and there would be no necessity for such evidence, as there could be no difficulty in proving the fact if it existed, by better and unquestionable proof. Thus, if the defendants knew, as the plaintiff contends they did from their general intelligence and intimate acquaintance with the nature and location of Lake Erie, that there was no harbour there, there would be no greater difficulty in making it appear than in ordinary cases. Hence there is no necessity for the introduction of such evidence, and I think very great danger would ensue from its introduction.

The evidence contained in the seventh, eighth, ninth, and tenth bills was properly overruled, as it amounts to nothing more than an expression of an opinion of the practicability of making a good artificial harbour at that point, similar to those already made on Lake Erie. The court allowed the plaintiff to prove that a good harbour could be made, but refused to admit evidence of harbours elsewhere. They also permitted him to prove the localities, the grounds on either side, and all the features pertaining to a good harbour, from which the jury might judge of its fitness for that purpose. In this, we do not see such palpable error as calls for a reversal of the judgment.

We also think the court was right in overruling the testimony contained in the eleventh bill, because it was immaterial who were the members of the legislature from the county of Erie when the contract was made, or in what part of the county they resided.

Judgment affirmed.