McCall vs. The United States.

AFFIRMED.

DECEMBER TERM, 1876.

PRESENT.

HON. PETER C. SHANNON, CHIEF JUSTICE.

HON. ALANSON H. BARNES, }
                                          } ASSOCIATE JUSTICES.
HON. GRANVILLE G. BENNETT, }

McCALL v. THE UNITED STATES.

*I. EVIDENCE:* BEST OR HIGHEST: REASON OF RULE. The principle of the rule requiring the best or highest evidence, is founded on the presumption that there is something in the better evidence which is withheld, adverse to the party resorting to inferior or secondary evidence.

2. ———: ———: EFFECT OF THE RULE The general effect of the rule is to prevent fraud, and to induce parties to bring before juries the kind of evidence least calculated to mislead or perplex them. The reason of the rule limits the extent of its application; consequently it does not operate where the law itself obviates the presumption of fraud, which would otherwise arise.

> *Application of the rule:*—In general to prove that a person is a public officer, it is sufficient to show that he is acting as such. So where a document is of a public nature, a copy is sometimes admitted, for the production of the original is dispensed with on account of the inconvenience resulting from the frequent removal of such papers; and therefore, the absence of the original affords no presumption of fraud.

3. ———∴ HEARSAY: ADMISSIBILITY. The admissibility of hearsay on questions of public right, is so well established upon authority, that its competency is not disputed, however widely courts may differ upon its force and effect. Where the question is as to territorial limits, and where the boundary concerns the extent of a public municipal jurisdiction, either public reputation, or the particular declarations of deceased persons, made *ante litem motam*, are receivable.

4. ———: PUBLIC DOCUMENTS: OFFICIAL PUBLICATIONS. All publications of State papers, maps, charts, and public documents, when such publications are by authority of Congress, are as valid evidence as the originals from which they were copied, and may be introduced and read as evidence on mere inspection.

5. ———: MAPS: GROUNDS OF ADMISSION. Maps stating boundaries are receivable in evidence, provided it appears that they have been made by persons having adequate knowledge. And in cases where they have been admitted, their admissibility has depended on the ground of their being *public documents*, or upon the other ground of their being in the nature of admissions.

6. *INDICTMENT:* CONSTITUENT ELEMENTS: RIGHTS OF ACCUSED. In criminal cases, prosecuted under the laws of the United States the accused has the right " to be informed of the nature and cause of the accusation against him," and the indictment must set forth the offense with clearness and all necessary certainty to apprise the accused of the crime with which he stands charged.

7. ———: OBJECTS OF: CERTAINTY. The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had.

8. ———: COPY TO ACCUSED: WAIVER. A person indicted under the laws of the United States for any other capital offense than treason is entitled to the privilege of having delivered to him a copy of the indictment and list of jurors and witnesses, at least two entire days before trial. *Held:*—That the entry of a plea of not guilty and proceeding to trial by defendant is a waiver of the statutory privilege, and cures the objection that no copy of indictment was furnished or that the copy served was defective.

*9. JURISDICTION:* INDIAN RESERVATION: HOMICIDE.  A trial for homicide committed on an Indian reservation must be had on the Federal side of a Territorial court, and is governed by the United States statutes and the rules of the common law.

*Writ of Error to the Yankton County District Court.*

THE facts are stated in the opinion.

*Oliver Shannon,* for plaintiff in error.

*William Pound,* U. S. Attorney, for defendant in error.

SHANNON, C. J.—The defendant below was, on the 18th of October, 1876, indicted on the Federal side of the District Court, for the murder of William Hickock, *alias* "Wild Bill." He pleaded " not guilty;" and on the 6th of December, 1876, the jury brought in a verdict of " guilty of murder as charged in the indictment."

After the overruling of motions in arrest of judgment and for a new trial, the District Court, on January 3d, 1877, sentenced the prisoner to death, and immediately thereupon this writ of error was sued out.

The indictment charges that the offense was committed in the Sioux Indian Reservation, set apart under the treaty proclaimed February 24th, 1869, at a place in said reservation called Deadwood in said district and territory, said reservation then and there being in the Indian country, and a place within the sole and exclusive jurisdiction of the United States, and within the jurisdiction of this court.

To establish the *locus in quo,* the prosecution offered without objection oral evidence tending to show that Deadwood is a place or gulch in the Black Hills, of over fifteen hundred inhabitants, and reputed to be in this Territory; also, that it is located on Whitewood Creek, is about eight miles farther west than Bear Butte, and that Bear Butte is a prominent landmark, and can be seen for forty miles this way.

Further, to show that Deadwood and Bear Butte are within this district, the prosecution offered a printed volume, the title-page being in the words and figures, as follows:

" 44th Congress, 1st session, House of Representatives. Ex. Doc. 1, Part 2, Vol. 11. Annual report of the Chief of Engineers to the Secretary of War, for the year 1875, in two parts. Part II.—Washington, government printing office, 1875."

Also with said book, two maps appertaining thereto, one being " map of the Black Hills from a reconnoissance by Capt. William Ludlow, corps of engineers, 1874, and maps of Warren and Raynolds;" and the other being " a geological map of the Black Hills by Professor N. H. Winchell, to accompany the report of Capt. William Ludlow, United States engineers."

This offer of the book and its maps, was objected to by the counsel for the defendant, as incompetent, irrelevant, not the best evidence, etc.

The objection was overruled, and the evidence admitted; to which ruling an exception was taken.

The prosecution as to the *locus in quo*, also offered in evidence " National map of the territory of the United States " from the Missippi River to the Pacific Ocean—made by the " authority of the Hon. O. H. Browning, Secretary of the " Interior—in the office of the Indian Bureau, chiefly for " government purposes, under the direction of the Hon. N. G. " Taylor, Commissioner of Indian Affairs, and Hon. Chas. E. " Mix, Chief Clerk of the Indian Bureau; compiled from " authorized explorations of Pacific Railroad routes, public " surveys, and other reliable data from the departments of " the government at Washington, D. C., by .W. J. Keeler, " Civil Engineer, 1867."

The offer was objected to as incompetent, and because the map is not sufficiently identified and proved. The objection was overruled, and the map allowed to be given in evidence. To this ruling an exception was taken.

In this connection, the prosecution likewise offered in evidence a map of the Territory of Dakota upon which is printed these words, to-wit: " Department of the Interior— General Land Office—S. S. Burdett, commissioner, Territory of Dakota, 1876, compiled from the official records of the

General Land Office, and other sources, etc., the said map being bound with other maps, in a volume, or atlas, the printed title-page of which is in the following words and figures:

" Department of the Interior, General Land Office, geographical and political atlas of the States and Territories of the United States of America, in which the public land surveys are now in operation. S. S. Burdett, commissioner, Washington City, 1876."

To support the offer, William P. Dewey testified *inter alia,* as follows: " I am the Surveyor General of this Territory. This map is official; it was transmitted to me officially by the Commissioner of the General Land Office, as an official map from that office, and with it an official communication. The original draft of this map was made in my office in 1875, and forwarded to the department prior to September 1st, 1875."

Edward F. Higbee, an attache of the Surveyor General's office, testified *inter alia,* as to this map, as follows: " I took the data from Ludlow's map. Col. Ludlow was topographical engineer with Custer's expedition. I took Ludlow's map as the source for putting down the Black Hills as set forth in this map."

The defendant, by his counsel, objected to the introduction of this map as evidence, because of its incompetency, and that it is not a certified copy of the original survey, or map, or drafts. The objection was overruled, and an exception was taken.

The volume entitled "annual report of the Chief of Engineers to the Secretary of War," contains the report, made by William Ludlow, captain of engineers, U. S. A., of a reconnoisance of the Black Hills of Dakota, made in the summer of 1874; with a summary table of daily instrumental observations, with deduced altitudes, *the latitude* and *longitude* of each camp, distances traveled, etc.; to which table the particular attention of the jury was called by the U. S. Attorney. The expedition, according to the report, encamped six or seven miles south of Bear Butte on the 14th and 15th

of August; and it is spoken of as "a well-known landmark," and "a well-known point north of the Black Hills." The table shows the latitude of the Bear Butte camp to be 44 degrees, 23 minutes, 43 seconds; and the longitude 103 degrees, 25 minutes, 19 seconds.

The question here presented, is, did the District Court err in allowing the foregoing matters to be given in evidence to the jury?

The principle of the rule requiring the best or highest evidence, is founded on the presumption that there is something in the better evidence which is withheld, adverse to the party resorting to inferior or secondary evidence. The general effect of the rule is to prevent fraud, and to induce parties to bring before juries the kind of evidence least calculated to mislead or perplex them. And the reason of the rule limits the extent of its application; consequently, it does not operate where the law itself obviates the presumption of fraud, which would otherwise arise. Hence, in general, to prove that a person is a public officer, it is sufficient to show that he acted as such. So, where a document is of a public nature, a copy is sometimes admitted, for the production of the original is dispensed with on account of the inconvenience resulting from the frequent removal of such papers; and therefore, the absence of the original affords no presumption of fraud.

The admissibility of hearsay on questions of public right, is so well established upon authority, that judges the most fastidious in regard to this kind of evidence, do not pretend to dispute its competency, however widely they may differ upon its force and effect. It may, therefore, be taken as settled, that where the question is as to territorial limits, and where the *boundary* concerns the extent of a *public municipal jurisdiction*, (as whether lands lie, or rights are exercisable within its true limits), either public *reputation*, or the particular declarations of deceased persons, made *ante litem motam*, are receivable. (Note 87, 1 Ph. on Ev., page 180; see also *Ellicott v. Peal*, 10 Peters, 435, 438, where reputation of matters or claims of a public nature, and general reputation as to boundary, are held to be admissible.)

In England, in the case of *Rex. v. Holt*, 5 Term Rep., 436, the King's bench held that the London Gazette was *prima facie* evidence of matters of state. In 1 Ph. on Ev., § 619, it is stated that the courts will notice the London Gazette, without proof that it was bought at the Queen's printers, or other proof of the place whence it came. And in 2 Ph., § 276, it is said that the public acts of government, and acts by the King in his political capacity, are commonly announced in the Gazette published by authority of the crown; and the Gazette is admitted in courts of justice as evidence of such acts.

Accordingly, in *Radcliffe v. United States Ins. Co.*, 7 Johnson's Rep., page 50, Kent, Chief Justice, held as admissible a letter of Mr. Canning to Mr. Pinkney, printed at the city of Washington by persons who were printers to Congress; the printed letter composing part of a set of public documents transmitted to Congress by the President of the United States. And to the same purport is the case of *Root v. King*, 7 Cowen's R., 613–36.

In *Talbot v. Seaman*, 1 Cranch, 38, a French decree was allowed by the Supreme Court of the United States, to be read, upon no higher proof, than that which attended the letter—in the New York case, *supra*.

In *Watkins v. Holman*, 16 Peters, 53, certain documents were offered, contained in a volume of State papers published under the authority of Congress. M'Lean, J., in delivering the opinion, said: " The volume of State papers offered in " evidence by the defendants, we think should have been ad- " mitted. This volume was published under an act of Con- " gress, and contained the authentication required by the act. " Its contents are, therefore, evidence." He further remarked that " in this country, in all public matters, the journals of " Congress, and of the State legislatures are evidence; and " also the reports which have been sanctioned and published " by authority. This publication does not make that evi- " dence which, intrinsically, is not so; but it gives, in a most " authentic form, certain papers and documents. In the case " under consideration the volume of documents was offered

" to show the reports of certain commissioners under an act
" of Congress conferring the title. in question. Now, this
" original report, duly authenticated by the Treasury Depart-
" ment, to which it was made, would be evidence, and it is
" evidence in the *public volume*. The very highest authenticity
" attaches to these State papers, published under the sanction
" of Congress."

In *Bryan, et. al. v. Forsyth*, 19 Howard, 334, it appears that,
in the Circuit Court, the plaintiff offered in evidence the
printed report of Edward Coates, the register of the land
office at Edwardsville, as found in the American state papers,
Vol. 3, from pages 421 to 431, inclusive; to which the de-
fendant objected, because it was not without proof of its
authenticity, legal evidence. The Circuit Court overruled the
objection, and the report was given in evidence to the jury,
to which ruling the defendant's excepted. Mr. Justice Catron,
in pronouncing the opinion of the Supreme Court, says
"these State papers were published by order of Congress,
" and selected and edited by the Secretary of the Senate and
" Clerk of the House. They contain copies of legislative and
" executive documents, and are as valid evidence as the orig-
" inals are from which they were copied; and it cannot be
" denied that a record of the report of Edward Coates, as
" found in the printed journals of Congress, could be read
" on mere inspection as evidence that it was the report sent
" in by the Secretary of the Treasury."

And in *Gregg, et. al. v. Forsyth*, 24 Howard, 179, Mr. Justice
Campbell in delivering the opinion of the Supreme Court,
reiterates the foregoing decision, adding that " the volumes
" of the American state papers, three of which were pub-
" lished by Duff Green, under the revision of the Secretary
" of the Senate, by order of the Senate, contain authentic
" papers which are admissible as testimony without further
" proof."

As to maps stating boundaries they are receivable in evi-
dence, provided it appears that they have been made by
persons having adequate knowledge. And in the cases where
they have been admitted, their admissibility has depended

on the ground of their being *public documents*, or upon the other ground of their being in the nature of admissions. (1 Ph. on Ev., §§ 225–77.)

By the Act of Congress of June 23, 1874, chapter 456, the term "*public document*" is defined to be all publications printed by order of Congress, or either house thereof.

Title XLV of the Revised Statutes of the United States, relates to " public printing, advertisements, and public documents." It provides for a government printing office, congressional printer, and for a joint committee on public printing consisting of three members of the Senate and three members of the House of Representatives. Section 3779 declares that " whenever any charts, maps, diagrams, views or other engravings are required, to illustrate *any document* ordered to be printed by either House of Congress, such engravings shall be procured by the congressional printer, under the direction and supervision of the committee on printing of the House ordering the same.

By section 3781, the congressional printer may contract for the lithographing of the maps of the several States and Territories accompanying the annual report of the Commissioner of the General Land Office.

By the Act of Congress of June 20, 1874, the title of the congressional printer is changed to public printer; and he is deemed an officer of the United States, and is appointed by the President, by and with the advice and consent of the Senate. See also Act of Congress of July 31, 186´, chapter 246, pages 1045, under head of public printing.

The Act of June 23, 1874, chapter 455, makes an appropriation for engraving and printing the plates illustrating the report of the geographical and geological explorations and surveys west of the one hundredth meridian, to be published in quarto form, the printing and binding to be done at the government printing and binding office.

The Act of July 31, 1876, chapter 246, provides for " photo-lithographing and printing the large connected land map of the United States and Territories;" " for geographical surveys of the Territories west of the one hundredth meridian; and

for preparing, engraving, and printing the cuts, charts, plats, and atlas sheets for geographical surveys west of the hundredth meridian." See also page 163 of pamphlet laws of Congress, session 1, 1876, chapter 287.

After careful consideration, the conclusion is reached that there was no error in the admission of the book, or of any of the maps, in evidence.

The question next to be considered is in reference to the defendant's objection, that no copy of the indictment was served upon him as required by law. In criminal cases, prosecuted under the laws of the United States, the accused has the constitutional right " to be informed of the nature and cause of the accusation against him." Amendment VI.

In *United States v. Miller*, 7 Peters, 142, this was construed to mean, that the indictment must set forth the offense "with clearness and all necessary certainty, *to apprise the accused of the crime with which he stands charged.*"

The object of the indictment is first, to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had.

In addition to the constitutional right of having the indictment read on arraignment, by section 1033 of Revised Statutes of the United States, any person indicted of any other capital offense than treason, is entitled to the privilege of having delivered to him a copy of the indictment and list of jurors and witnesses, at least two entire days before the trial.

This section is a substitute for a similar provision contained in section 29 of the Act of Congress of April 30, 1790; which, in its turn, seems to have been prompted by the Act of Parliament of 7 w 3, c 2, and 7 Ann. C., 21, § 11, relating to certain species of treason.

In England, as well as in this country, the furnishing of a copy of the indictment, etc., in such cases, has always been

considered as a privilege attached by statute, and designed and created solely as an incident of the punishment to which the offense subjected the offender.   The intention was, and is merely, for the sake of better enabling the person indicted to make answer by motion to quash, by demurrer, plea of former conviction or acquittal, or by other plea.

In England, by the common law, the prisoner upon arraignment, was bound to plead *instanter;* and how, without a copy, and without legal assistance, could he answer advisedly as to any defects or matters preliminary to the trial? To alleviate this hardship of the common law, the English Statute of Ann provided that the copy, etc., should be delivered ten days " before the trial," whilst ours prescribes " at least two entire days *before the trial*."   As to the words " before trial," the English construction was, that this must be intended *before arraignment*, because the prisoner must plead instanter upon his arraignment, which was his time for pleading.

But in the case of *The United States v. Curtis*, 4 Mason, 232, it was held that the word *trial* in our act of 1790, means the trying of the cause by the jury, and not the arraignment and pleading preparatory to such trial.

Which of these constructions is finally to prevail, is of no material consideration in the present case; for on his arraignment before Mr. Justice BENNETT, on the 18th of October, 1876, the record discloses that after the indictment was read to him, " the court stated to defendant that he could plead then " to the said indictment, and was, at the same time, notified " and admonished that he could afterwards withdraw his " plea if he chose to do so, for the purpose of entering a de- " murrer, motion, or other plea."   After this notification and full understanding, the defendant pleaded " not guilty."   It is thus seen, that he was not then compelled to plead, but left to his option; but if he should do so, even in such case his pleading was not to be construed as a waiver of any of his rights, or attended with any prejudice thereto.   The calling and impanelling of the jury did not occur until the 4th of December, forty-seven days after arraignment and plea; so that ample time and opportunity were afforded to withdraw

the plea, if deemed expedient, and to move to quash, to demur, or plead, *de novo.* At no stage of the proceedings during the interval between plea and the calling of the jury, or afterwards, did the defendant, or his counsel, ask, or intimate a desire, to withdraw the plea, for any purpose. No trial, judgment, or other proceeding on an indictment, can be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant. (§ 1025, R. S. of U. S.) Moreover, the record shows that, on the 4th of December, the defendant being in court with his counsel, the U. S. Attorney moved " to proceed with the trial of the issue in this case; *and no objection being now made*, it is so ordered." And the record also shows that on a prior day, to-wit: the 1st of December, when a list of the jury and of the witnesses to be produced on the trial, was delivered to the defendant, the court informed him that he had " at least two entire days before the trial within which time to make any preliminary motion or plea."

The objection that no copy of the indictment was served upon the defendant as required by law, was first raised upon the trial, and after the prosecution had closed its testimony and rested its case. It is of a two-fold nature; first, that although a true copy was given to one of the defendant's counsel, on the 18th day of October, yet it should have been delivered to the defendant himself, and to no one else; second, that although another (alleged) copy was, on the first day of December, actually delivered to the defendant, personally, yet it was defective.

As to the first copy, the U. S. Attorney testified, that he delivered it to the defendant's attorney, in the presence of the defendant. On the other hand, the latter attorney, whilst admitting, in his affidavit, the main facts, states that his " *recollection* is that said copy was handed him after the case was over in court," (that day, the 18th of October), " and after the prisoner had been remanded."

By the letter of the statute, the copy is to be delivered to the person indicted. But as a main object of this law is to give the counsel for the accused a full opportunity of dis-

covering defects in the indictment, as well as to enable them to make full defense, and as it is their duty to see that all the proceedings are regular, that the prisoner lose no advantage, and generally to advise him for his benefit; it is somewhat difficult to perceive how, in this case, the spirit of the statute has been disregarded. It might, indeed, be argued that the intent is better effectuated by delivery to the counsel, whose sworn duty it is to guard the rights and privileges of the accused, rather than by giving it to him personally; for, in the vast majority of cases, a defendant can find no other use for it, than to hand it over to his counsel, learned in the law.

As to the copy delivered to the defendant himself on the first day of December, it is manifest that it is variant from the original; and principally in this, that, strangely enough, it omits the Christian name of the person killed, wherever his Christian and surname appear in the indictment, and in each case adds words, not found therein, to-wit: "Whose Christian name is to said jurors unknown."

But irregularities may be waived, and will commonly be held to be waived, if the party entitled to complain of them shall take any subsequent step in the case inconsistent with an intent on his part to take advantage of them. If by pleading " not guilty," the prisoner waives an objection that the copy of the indictment delivered to him was defective, (as was held in *U. S. v. Cornell*, 2 Mas., 193), by how much more strength of reasoning is that objection waived when, after proceeding to trial and waiting until the entire evidence of the prosecution is in, and the government's case is rested, the objection is for the first time made?

In several English cases it was held, that no objection can be taken to the fullness of a copy, or to any defect therein, after the indictment has been pleaded to. (Rockwood's case, 4 State Trials, 646; Foster, chapter 111, page 230; 1 East, P. C. 113, citing Gregg's case, Cook's case, and others; Bac. Ab. 545, Tit. treason, cc.)

In *State v. Jordon*, Walk. 392, it was held that a plea of not guilty and proceeding to trial, is a waiver of the statutory

privilege of having a copy of the indictment and venire two days before the trial.

In *Comm. v. Betton*, 5 Cush., 427, where a copy omitted certain words, and the trial proceeded without any objection being made to the sufficiency of the copy, it was held that the objection was thereby waived.

In Ohio an omission on the part of the State to furnish the accused with a true copy of the indictment at least twelve hours before trial, as provided by statute must, to be available, be interposed as an objection before trial; and if waived then, it cannot be made a ground of error after trial. (*Fouts v. The State*, 8 Ohio St. Rep., 98; *Smith v. The State*, 8 Ohio Rep., 294.)

In the report of the case of *U. S. v. Hare*, (2 Wheeler Cr. Cases, 283), tried at Baltimore, in 1818, the defendants, on arraignment, were told by the court that they must plead instanter, but that their pleas should not be considered with any prejudice to their rights, and might be withdrawn the next day if the counsel thought proper. The next day, their counsel did ask leave to withdraw the pleas, which was granted by the court, and they were withdrawn. Afterwards, on being told that they were to plead anew, the prisoners were again severally arraigned; and upon being asked whether they were guilty or not guilty, they stood mute and refused to answer. Thereupon the court ordered that the trial proceed by jury as if the prisoner had pleaded not guilty, in accordance with the act of Congress then in force. Accordingly when the clerk had commenced to call the jury, it was objected that no copy had been delivered at all, and the prisoner's counsel had no knowledge of the nature of the charge at the time of the arraignment, except what might be derived from hearing the indictment once read by the clerk. But the court after declaring that the whole proceedings had been strictly regular, and that they were satisfied they had given the prisoners all the privileges they were entitled to, ordered that the trial must go on; and a jury was called and sworn. This was tantamount to deciding that, under all the circumstances of the case, the prisoner had waived the priv-

ilege of a copy. And in furtherance of this view, it is stated by Chitty (Criminal Law, Vol. 1, 405) that if the prisoner plead without having claimed these statutory advantages, or when they have been imperfectly granted, he cannot afterwards take advantage of the defect, for his pleading has cured the objection.

To conclude, a true copy of the indictment in the present case, was delivered to counsel of defendant (and in his presence, as positively sworn to by the U. S. Attorney), forty-seven days before the trial; secondly, a defective copy was delivered to the defendant himself, three days before trial; thirdly, the plea of the 18th of October, could have been withdrawn during the interval, for any advantageous purpose, but no attempt to do so was made—the defendant and his counsel thereby tacitly acquiescing (after abundant time for deliberation) in the propriety and wisdom of the original plea; and lastly, the defendant, without making any objection, went to the jury on that issue.

By having entered upon trial, and by having waited until the prosecution closed its case, the defendant was too late to make the objections referred to, concerning these copies; for, by such conduct and acquiescence, he virtually admitted that he had a copy sufficient for all the purposes intended by the act of Congress.

As to the objection that the defendant should have been indicted and tried on the other side of this court, it is well settled that a trial for homicide committed in an Indian reserve, must be had on the Federal side of a Territorial court, and is governed by U. S. statutes and the rules of the common law.

Perceiving no error as to the other objections, and there being no exception or complaint to the law as charged by the court below, it is, therefore, this day—the 19th of January, A. D., 1877,—all the said premises and the record being, by the whole court, here, fully known and considered, *adjudged*, that the judgment of the said District Court be, and the same is hereby affirmed in all respects; and the cause, with the record, is remitted to that court, with the order that the said judgment therein rendered be executed.

All the Justices concurring.